HARRY GOLDKLANG, PETITIONER-APPELLEE, v. METRO-
POLITAN LIFE INSURANCE COMPANY, RESPONDENT-
APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted October 29, 1973—Decided February 1, 1974.

308

Before Judges HANDLER, MEANOR and KOLE.

*Messrs. Haskins, Robottom and Hack,* attorneys for respondent-appellant on the appeal and for appellee on the cross-appeal.

*Messrs. Dubowsky and Davis,* attorneys for petitioner-appellee on the appeal and for appellant on the cross-appeal.

PER CURIAM. On October 21, 1965, Harry Goldklang (the employee) sustained a myocardial infarction. The Division of Workmen's Compensation (the Division) determined that it was work-connected and compensable and on April 2, 1968 entered a formal award of 25% of partial per-

manent total disability against the employer, Metropolitan Life Insurance Company. In 1970, the employee filed an application for review or modification of the 1968 award. After a hearing, the Division dismissed the application, finding that, since he had had no new accident or infarction since 1965, his "present disability is attributable to the natural progression of his severe coronary artery disease." On a *de novo* appeal, the county court reversed and awarded 100% permanent total disability. The latter included severe coronary insufficiency, an enlarged heart and congestive heart failure.[1] The employer appeals without in any way disputing the extent of disability if the county court's determination is correct.

The scope of our review is limited on an appeal from the county court in a workmen's compensation case, even where the court's fact determinations are contrary to those of the compensation judge. If the county court's findings are reasonably supportable on the whole record before it, giving due regard to the conflicting findings of the compensation judge based on his special expertise or superior opportunity to appraise witnesses' credibility, the county court's judgment should be affirmed. *Close v. Kordulak Bros.*, 44 *N. J.* 589, 599 (1965); *Kaplowitz v. K & R Appliances, Inc.*, 108 *N. J. Super.* 54, 62 (App. Div. 1969). See also *MacDonald v. Hudson Bus Transportation Co.*, 100 *N. J. Super.* 103 (App. Div. 1968); *Stallone v. Schiavone-Bonomo Corp.*, 103 *N. J. Super.* 170 (App. Div. 1968), certif. den. 53 *N. J.* 226 (1969); *Pankiewicz v. N. J. Bell Telephone Co.*, 105 *N. J. Super.* 287 (1969), aff'd. 53 *N. J.* 559 (1969).

---

[1]Dr. Goodman, the employee's medical expert, gave as his diagnosis: "arteriosclerotic heart disease with the residuals of acute myocardial infarction, aortic stenosis, severe coronary and myocardial insufficiency, cardiac panarrahythmia with the residuals of a post myocardial infarction pulmonary embolism." Dr. York, the employer's expert, diagnosed the present condition as "arteriosclerotic cardiovascular disease, with an enlarged heart, and he also had chronic bronchitis with pulmonary emphysema."

Applying that principle of appellate review, we are satisfied that in this close heart case the county court's findings and judgment as to compensability are reasonably supportable by the record and should be affirmed, substantially for the reasons given in its opinion.[2]

Matters of credibility such as witness demeanor or other factors of trustworthiness uniquely available to the tribunal before which evidence is adduced in our view were not involved in the compensation judge's decision. Even if the employee's testimony as to his allergy or his employment in the business of selling insurance since the 1965 infarction were false, we are not persuaded that that judge's conclusion in any way was influenced thereby. Similarly, in the light of the other evidence in the record, his continued employment since October 28, 1966 as an insurance salesman does not necessarily impugn Dr. Goodman's testimony that he had a "straightforward downhill course" after the infarction.

Moreover, the compensation judge's conclusory determination of lack of causation between the 1965 infarction and the present disabilities, to the extent it represents an exercise of expertise, is not supported by articulated reasons grounded in the evidence.

Dr. Goodman's statement of the operative factors leading to his opinion on causation might have been stated with greater precision. Nevertheless, it meets the preponderance of evidence standard that the employee here must sustain to prove the medical causal relationship, to a material and substantial degree, between his 1965 infarction and his present condition. Additionally, Dr. Goodman's testimony, in contrast to that of Dr. York, accords with the kind of expert proofs as to such causation required in heart cases generally and in matters such as this where increased disability

[2]We note an apparent error in the opinion as to the first hospitalization in Christ Hospital. The period should be from June 24 to June 28, 1968, rather than June 24 to July 28, 1968.

is claimed. *Dwyer v. Ford Motor Co.*, 36 *N. J.* 487, 493–494 (1962); *Close v. Kordulak Bros., supra,* 44 *N. J.* at 600–601; *Schiffres v. Kittatinny Lodge, Inc.*, 39 *N. J.* 139, 148–149 (1963); *Aladits v. Simmons Co.*, 47 *N. J.* 115, 125 (1966). See *Russo v. Teachers Pension and Annuity Fund,* 62 *N. J.* 142, 147 (1973).

A court must act on the basis of the record before it, and even a tribunal with expertise must predicate its ultimate determination on findings sustained by proofs to which it applies its special knowledge. See *Szumski v. Dale Boat Yards, Inc.*, 48 *N. J.* 401, 410 (1967); *Application of Howard Savings Institution of Newark,* 32 *N. J.* 29, 52 (1960); *Talocci v. Strelecki*, 93 *N. J. Super.* 567, 572 (App. Div. 1967)[3].

■ The employer contends that since Dr. Goodman did not examine Goldklang until February 2, 1971, there is a lack of the comparison between his condition in 1968 and his present condition required to prove that the compensable disability increased. It argues that Dr. Silberner, the cardiologist whose reports were used in 1968, Dr. Frank, Goldklang's principal cardiologist, and Dr. Schneider, apparently his present treating physician, should have been produced to testify for this purpose. We find the contention to be without merit. Both Dr. Goodman and Dr. York agreed that Goldklang was 100% industrially disabled at the time of the hearing. A changed condition may properly be shown by the testimony of a physician who has examined the employee and compared his findings with those of the earlier examining physicians. *Yeomans v. Jersey City*, 27 *N. J.* 496, 512 (1958).

---

[3]The causal relation between a compensable infarction and subsequent increased coronary or heart disability is not precluded automatically merely because a substantial period of time has elapsed since the infarction, even though the employee has an underlying heart condition or sclerotic disease of the coronary arteries which is progressive in nature. The matter is still one of proof of medical causation. *Schiffres, supra,* 39 *N. J.* at 150; *Close, supra,* 44 *N. J.* at 601.

The county court denied the employee reimbursement for $6,811.95 in expenses involving a series of hospitalizations commencing June 24, 1968. The employee cross-appeals from this portion of the judgment.

Admittedly, prior to filing the present petition for review or modification, the employee did not notify the employer of his need for treatment or hospitalization, as required by *N. J. S. A.* 34:15–15. There is no evidence that such notice would have been futile, at least until the employer filed its answer denying liability, or that the hospitalizations are within any statutory exception dispensing with the notice requirement. See *Benson v. Coca Cola Co.,* 120 *N. J. Super.* 60 (App. Div. 1972); *Colbert v. Consolidated Laundry,* 31 *N. J. Super.* 588 (App. Div. 1954).

However, the petition does list the hospitalizations by places and dates and the pretrial memorandum in the Compensation Division provides that medical and hospital bills since the original accident will be submitted. Hence, the employer was aware prior to the hearing that these expenses might be claimed if increased disability were found. Yet the lack of prior notice of the employee's need for such hospitalization was not raised by it in the answer, the pretrial memorandum or at the hearing before the compensation judge. Accordingly, that defense was waived. See *Conway v. Mister Softee, Inc.,* 51 *N. J.* 254 (1968); *Hinz v. Western Electric Co. Inc.,* 9 *N. J. Super.* 93 (App. Div. 1960). The part of the county court judgment denying reimbursement of hospital expenses must be reversed.

The focus of the hearing in the Division was on the issue of compensability. Dr. Goodman, over objection, testified as to the reasonableness of the hospital expenses. Although no contrary evidence was offered, the proofs as to the necessity for or reasonableness of these substantial expenses was sparse. Additionally, there was no evidence that the employee, rather than a third party, was entitled to payment from the employer of any particular hospital bill. See *N. J. S. A.* 34:15–15, 34:15–15.1; *Stafford v. Pabco Products,*

*Inc.,* 53 *N. J. Super.* 300 (App. Div. 1958); *Bielak v. Counties Contracting & Const. Co.,* 95 *N. J. Super.* 266 (Law Div. 1967); *Hunt v. Hospital Service Plan of N. J.,* 33 *N. J.* 98 (1960).

These circumstances require that a plenary hearing be held before the Division as to the hospital expenses so that an appropriate determination may be made with respect thereto.

The judgment of the county court is affirmed in part and reversed in part. The case is remanded to the Division of Workmen's Compensation for further proceedings consistent with this opinion. We do not retain jurisdiction.

MEANOR, J. A. D. (dissenting). Because I believe that the majority and the County Court failed to give the required heed to the recognized expertise of the Workmen's Compensation Court in medical matters, and have therefore decided this case on a basic misunderstanding of the relationship between myocardial infarction and arteriosclerotic heart disease, I dissent.

The relevant medical history of this petitioner begins in September 1962 when he was hospitalized in the Jersey City Medical Center for a herniorrhaphy. During this hospitalization an old, silent antero-septal myocardial infarction was discovered. There was no history consistent with coronary disease.

On October 21, 1965 petitioner, a life insurance salesman, was escorting a prospective insured to a doctor's office for a physical examination. While ascending a flight of stairs he suffered chest pain. It seems to be agreed that he suffered another myocardial infarction at this time. A series of electrocardiograms taken during this hospitalization resulted in the following interpretations: left ventricular parietal block; prolonged intraventricular conduction; marked left axis deviation; antero-septal myocardial infarction — age not determined; old myocardial infarction; intraventricular conduction disturbance; old anterior myocardial infarction with peri-infarction block; anterior myocardial infarction —

age not determined. These diagnoses, taken from several EKG's, are, of course, repetitive but consistent.

A claim petition was filed in the Workmen's Compensation Court as a result of the attack of October 21, 1965. After a hearing on March 15, 1968 petitioner was awarded "twenty-five percent permanent partial disability." At this hearing petitioner said of his then condition that he limited himself in his work because "if I work for any long period of time I tire" and further "But generally I feel all right now." Early in March 1968 petitioner had retired from respondent, having returned to work in October 1966. The medical reports stipulated into evidence, one for petitioner, one for respondent, noted the old 1962 infarct and diagnosed arteriosclerotic disease, myocardial infarction (old) and left bundle branch block. The remainder of that portion of the reports set forth in the present record deals with the extent of disability.

On June 24, 1968 petitioner was confined to Christ Hospital, Jersey City, and was discharged June 28. The diagnoses were thrombophlebitis (deep) left leg and arteriosclerotic heart disease. He was further admitted to Christ Hospital on May 25, 1969 and discharged June 13. The final diagnoses: arteriosclerotic heart disease and acute bronchitis. Chest x-ray interpretation was as follows:

There is cardiac enlargement. There is prominence of the aortic knob. There is blunting at both costophrenic angles and increased bronchovascular markings with blurring and indistinctness of these vessels are noted. I suspect the patient has pulmonary congestion, perhaps congestive failure. *Arteriosclerotic disease is probably the underlying cause.* [Emphasis added]
  IMPRESSION: Arteriosclerotic changes. Enlarged heart. Pulmonary congestion and changes suggesting congestive failure.

The next admission, again to Christ Hospital, took place June 29, 1969 with discharge on July 2. A possible neoplasm of the lung was ruled out by pathology report dated the day of discharge. The diagnoses were chronic bronchitis and multiple pulmonary emboli.

On July 27, 1969 petitioner was again confined to the same hospital, from which he was discharged August 8. The final diagnoses at this time were: pulmonary edema due to multiple pulmonary emboli; arteriosclerotic heart disease; enlarged heart; myocardial fibrosis. The discharge note reads in part as follows:

63 year old male with known coronary artery disease had recent episodes of pulmonary edema associated with cardiac arhythmia and pulmonary embolism (confirmed by lung scans). Readmitted to hospital in pulmonary edema. Evaluation — indicated presence of pulmonary emboli with infarction — bilaterally. Responded well to rest, anticoagulants, diuretics.

Petitioner was evaluated for cardiac surgery at Deborah Hospital, Browns Mills, N. J. from April 6 to 14, 1970. He was found to be not an apt candidate for such surgery. There was no evidence of myocardial ischemia. The final diagnoses were: arteriosclerotic heart disease; coronary artery disease; congestive heart failure; left bundle branch block; chronic bronchitis with early pulmonary obstructive disease; benign prostate hypertrophy. Recommendations for treatment were made. Reevaluation was sought in 12 months.

Petitioner was again confined to Christ Hospital from September 8 to 21, 1970. The final diagnoses at this time were: acute pneumonia RUL (right upper lobe); arteriosclerotic heart disease; enlarged heart; regular sinus rhythm; multiple multifocal premature ventricular beats; left bundle branch block; previous multiple pulmonary infarctions.

Petitioner was again evaluated at Deborah Hospital in April 1971. The record of that episode contains the following:

FINAL DIAGNOSIS: Coronary artery disease with angina pectoris, probable papillary muscle dysfunction, left bundle branch block, premature beats, history of chronic congestive heart failure. 2. Chronic bronchitis with chronic obstructive pulmonary disease. 3. Benign prostatic hypertrophy.
CONCLUSIONS AND RECOMMENDATIONS: Mr. Goldklang seems to be quite stable in spite of the severity of his chronic problem.

We suggest that he stay on the same medical program, except that perhaps the Lasix need not be administered as often. We would like to see him again for another evaluation in one year.

PROGNOSIS: Fair.

Petitioner sought to reopen his 1968 award resulting from the 1965 infarct. His thesis was that his medical problems since that award, set forth above, were causally related to the 1965 infarct to a sufficient degree to authorize an award for increased coronary disability. The Compensation Court dishonored his claim; the County Court reversed and I am convinced that the initial tribunal reached the correct result.

On the reopener it was the petitioner's burden to prove by the preponderance of the evidence not only the fact that his disability had increased but that the increased disability was causally related to the original injury. *Schiffres v. Kittatinny Lodge, Inc.,* 39 *N. J.* 139, 148 (1963). The prior proceeding is *res judicata* at the time of the judgment entered therein, subject only to application for increase or decrease in the award by employer or employee pursuant to *N. J. S. A.* 34:15–27. *Schiffres, supra,* 39 *N. J.* at 148; *Hopler v. Hill City Coal & Lumber Co.,* 5 *N. J.* 466, 470 (1950). With respect to the burden of proof, petitioner must establish that his prior infarct caused his increased disability to a material degree — a degree greater than *de minimis. Dwyer v. Ford Motor Co.,* 36 *N. J.* 487, 493–494 (1962).

It would also be well to refer to a medical or medico-legal truism that underlies all discussion of work-connected myocardial infarctions. That is, work effort does not of itself cause coronary occlusion or myocardial infarction. Our cases have accepted the disputed medical proposition that employment effort or stress can so act upon the underlying disease of coronary arteriosclerosis as to precipitate an infarct. Thus, our cases speak of "precipitation" by the action of work effort upon the underlying disease. *Dwyer, supra,* 36 *N. J.* at 491–492; *Carr v. Campbell Soup Co.,* 124 *N. J. Super.* 382, 384 (App. Div. 1973); *Meines v. Hy Levine Associates,* 58 *N. J.* 548, 554–555 (1971); *Aladits v. Simmons*

*Co.*, 47 *N. J.* 115, 125 (1966). Everywhere it is clear medically and legally that one does not have a myocardial infarction unless he also has preexisting and underlying coronary artery disease. Hence, we reach the question in this and like cases, (*Schiffres, supra*), whether the increased disability resulted from the progression of the disease alone, or was contributed to in a material degree by the prior injury. This issue is the one posed by this record. Implicit therein is the recognition that long before October 21, 1965 petitioner suffered from coronary artery disease, though it was asymptomatic. This is clear not only from the infarction he suffered that day but also from the fact that he had the silent coronary discovered in 1962.

The first manifestation of increased disability to be dealt with is petitioner's claim that his deep vein thrombophlebitis, with its onset in June 1968 is, to the required degree, caused by his 1965 infarct. His expert, Dr. Rowland Goodman, an internist, never expressed more than a valueless conclusionary opinion that the 1965 infarct caused the thrombophlebitis. With reference to this subject he in fact stated:

Now, as you probably know, thrombophlebitis of and by itself is not caused by the heart attack, yet patients with myocardial infarctions are particularly prone to the development of clotting in the legs. It is for this reason that we give anticoagulants, both during the immediate treatment phase while in the hospital and many physicians give it for a long term afterwards. So that this is, in my opinion, a complication of his myocardial infarction, although in essence it wasn't caused by it.

I cannot accept this as expressing the reasoned conclusion called for by our cases, (*Dwyer, supra; Aladits v. Simmons Co., supra*), as a necessary prerequisite to a finding that the deep vein thrombophlebitis was caused by the 1965 infarct. Rather, to me, it establishes the opposite. If the doctor meant to say, as I think he did, that those who have suffered a myocardial infarct are more prone than members of the general population to have thrombophlebitis because they

are thus identified as more susceptible to disease of the arterial and vascular systems, then he supports respondent's position and the Compensation Judge's conclusion that the thrombophlebitis resulted from the progression of that disease and not the infarct. In my opinion the above testimony of Dr. Goodman does not support causal connection between the thrombophlebitis and the 1965 infarct. In fact, it denies it.

With respect to the left bundle branch block, Dr. Goodman said:

> He was found at that time to have arteriosclerotic heart disease; he had a left bundle branch block, and feel that this is, in itself, a direct outcome of the heart attack for the reasons which I said; namely, a complication, if not directly caused.

I don't know what the doctor means by a "complication." If he means to say that people to have infarctions and who therefore have underlying coronary artery disease are more prone to have the further complication of the disease called a bundle branch block, then, again, he supports the Compensation Court's conclusion. But I do not believe that the left bundle branch block is available as an item of increased disability. It was one of the diagnoses offered to the Compensation Court in the 1965 hearing and upon which the award was then made. The left bundle branch block was evident during the October 1965 hospitalization. It is the same thing as the left ventricular parietal block noted upon EKG reading at that time. *Res judicata* bars this claim.

With respect to the multiple pulmonary emboli and the disabilities resulting therefrom, they, too, can be excluded upon the basis of Dr. Goodman's testimony alone. He said:

> * * * it was the conclusion that he was having multiple pulmonary emboli; in other words, clots breaking off from the previous thrombophlebitis and entering the lung. This is confirmed by the lung scan which was performed on 7–1–69. The impression, the picture is compatible with multiple pulmonary emboli.

Thus, it is seen that the pulmonary emboli were caused by the thrombophlebitis which, as pointed out above, did not result from the 1965 infarct. The proper conclusion is obvious. So, too, with the pulmonary edema, due concededly to the pulmonary emboli as Dr. Goodman recited.

Dr. Goodman's rationale that petitioner showed a "straightforward" downhill course from his 1965 infarct is belied by the record. He worked from October 1966 until his retirement in March 1968 without hospitalization or incident unusual for an infarct patient. This circumstance lends great support to the conclusion of respondent's internist, Dr. Jack S. York, that long prior to the onset of the episodes upon which the reopener was based petitioner's 1965 infarct had become "well stabilized."

With respect to the enlarged heart, Dr. Goodman said:

In my opinion, the initial myocardial infarction was so extensive and so severe that instead of normal healing taking place, there was progressive weakening of the heart. This is shown by the fact that the heart got larger and larger over the years because it was unable to pump blood adequately in its normal size.

It is obvious as the above statement implies that any muscle — and the heart is a muscle —will enlarge in an attempt to meet greater demands put upon it. But these demands did not result from the 1965 infarct. There was no heart enlargement noted in any hospital record until the admission of May 1969. From then on it appears as a consistent diagnosis. This circumstance makes it clear to me that heart enlargement did not arise from the 1965 infarct, but from the extra burden put upon his circulatory system by reason of the thrombophlebitis and its concomitants — pulmonary emboli and edema. It took a year from the onset of the circulatory burdening thrombophlebitis before the diagnosis of cardiac enlargement was made. Thus, there is ample support for the Compensation Court's implied acceptance of Dr. York's thesis that petitioner's cardiac deterioration was due to the extra burdens placed upon it by

the thrombophlebitis and the pulmonary emboli and edema it caused.

Dr. Goodman's testimony also indicates that the arrhythmia resulted from the bundle branch block, which has been excluded, and the enlarged heart, which as has been shown is related to the thrombophlebitis and its pulmonary complications and not the 1965 infarct. He also related the congestive failure to the heart's deterioration as a pump as evidenced by its enlargement. But this was due to the unrelated pulmonary disease. So, too, with the bronchitis which was said to be related to the congestive failure. He also stated that the pulmonary fibrosis resulted from the pulmonary emboli and this in turn makes it more difficult for the heart to pump blood. Dr. Goodman's examination brought forth no other evidence pertinent on the issue of causal connection.

Dr. Goodman conceded, as he must, that petitioner had arteriosclerotic cardiovascular disease at least as early as 1962 when he was age 56 and his silent antero-septal infarction was discovered. On cross-examination he admitted that this disease is progressive with age. Since Dr. Goodman did not mention several of the diagnoses of conditions that beset petitioner on and after June 1968, I can only conclude that there is no proof of their causal relationship and, therefore, in all probability, they resulted from the progressive nature of his coronary artery disease.

In my opinion Dr. Goodman chose his words carefully, calling the various conditions "complications" or "sequlae" of the infarct so as to seem to be asserting causal connection when in fact he was not. Our cases, *Dwyer* and *Aladits,* both *supra,* in order to establish causal connection, call for some reasoned explanation of the physiological mechanisms involved.

It is obvious that the crux of this case involves the issue of causal relationship between the 1965 infarct and the onset in 1968 of deep vein thrombophlebitis. A myocardial infarction is by definition death or necrosis of heart muscle tissue

arising from circulatory impairment. The evidence in this case is bereft of any explanation of how this 1965 event affected petitioner's circulatory system so as to lead to the development in 1968 of the thrombophlebitis from which ensued the later major diagnoses of pulmonary emboli and edema, congestive failure and cardiac enlargement. To me, petitioner did not prove his case, and I must come to the conclusion that there is no competent, credible evidence in this record to support the County Court's judgment that petitioner's increased disability was causally related to the 1965 myocardial infarct. *Schiffres, supra.* Accordingly, I would reverse the judgment below and reinstate that of the Workmen's Compensation Court.