234 N.J. Super. 64 (1989)
560 A.2d 89
JOHN LISTER, PETITIONER-RESPONDENT,
v.
J.B. EURELL COMPANY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 23, 1989.
Decided June 22, 1989.
*65 Before Judges O'BRIEN, SCALERA and STERN.
Robert M. Gilbert argued the cause for appellant (Robert G. Bressler, attorney, Robert M. Gilbert, on the brief).
Stephen Luminello argued the cause for respondent (Chasan, Leyner, Tarrant & D'Italia, attorneys, Stephen Luminello, on the brief).
The opinion of the court was delivered by SCALERA, J.A.D.
Respondent J.B. Eurell Company appeals from a workers' compensation judgment awarding petitioner John Lister total disability benefits for back injuries arising out of a work-related accident which occurred on December 3, 1985.
At the trial the parties stipulated that Lister was employed by Eurell on December 3, 1985, when he sustained the compensable accident. Thus, the issues at trial involved only the *66 extent of the temporary disability, medical treatment and the claimed permanent disability.
Lister testified through a Yugoslavian interpreter. He related that he was born on March 29, 1948 in Yugoslavia, attended school there until the eighth grade, and emigrated to the United States at age 17. At the time of the accident, he had been employed as a truck driver by Eurell for some 2 1/2 years, and his duties included both the driving and unloading of trucks. Lister explained that he was required to unload heavy ceiling tiles and insulation materials. It was while he was unloading heavy bundles of insulation from one truck and loading them onto another that he heard the lumbosacral area of his back "crack" and immediately experienced "terrible pain." He could neither bend down nor stand up straight but did not seek medical treatment until the next day.
Petitioner apparently first saw a compensation insurance company doctor, Dr. Robert Goldstone, on December 4, 1985 and was treated by him through January 20, 1986. During this period, he was also treated by a Dr. Goulart,[1] an insurance company neurologist, and a chiropractor named Dr. McBain, who provided physical therapy during some 20 visits.
He was admitted to St. Joseph's Hospital during the week of January 7, 1986, where he was treated for the pain and placed in traction, but no surgery was performed. He was again hospitalized on January 20, 1986 for an examination, after which Dr. Goldstone and Dr. Goulart told Lister that they wanted to perform surgery on his back to alleviate his condition. Petitioner testified that he refused the recommended operation because he was afraid of being paralyzed for the rest of his life. According to him, Dr. Goulart had told him that the surgery involved a risk of paralysis which he could not guarantee *67 would not occur. However, no expert medical evidence regarding paralysis was produced. After his release from the hospital, petitioner apparently continued to be treated by Dr. Goldstone until February 25, 1986. Thereafter, his compensation disability checks were terminated because he was no longer being treated by an "authorized" treating doctor and also because he refused to have the recommended back surgery.
Subsequently, in March 1986, without the compensation insurance company's authorization, petitioner went to see Dr. Jerome B. Margolies, who he claimed was an orthopedist and who treated his back problem with hot pads and medication. He was seeing Dr. Margolies once a week at the beginning but less frequently at the time of trial since he was feeling a "little better than ... before."
Since August 1986, petitioner has also been receiving treatment from Dr. Nicholas Marchese, a psychiatrist, for attacks of depression and nervousness which are manifested by screaming at his children, arguing with his wife and the like. The treatment consists of both medication and counseling. Petitioner explained that since his injury he has been so depressed that he has considered killing himself because of his poor health, loss of job and money, and inhibited sex life.
Because of the pain from his injuries, petitioner has never tried to work since this accident. He claims that he can only stand for 10 or 15 minutes at a time and has trouble walking up and down stairs; his left foot hurts a lot and it becomes numb approximately 30 to 40 times each day and he can only sit for 10 to 15 minutes before feeling discomfort. Regarding his present physical complaints petitioner summed it up by stating:
I'm not well. I'm still in pain. But I feel a little better than I was feeling before.
He admitted to having accidents in the past for which he received compensation benefits but denied that they involved his back. Finally, petitioner insisted that he knows only a little English and that that language is not spoken at home.
*68 None of the doctors or therapists who treated the petitioner over the years were called as witnesses at trial. Rather the case was tried solely on the basis of petitioner's testimony and of the various experts, each of whom concededly had only limited contact with him.
The first expert witness to testify on petitioner's behalf was Paul J. Kiell, M.D., a psychiatrist who performed a neurological and neuropsychiatric examination of petitioner on February 25, 1988, during which he obtained a "history" from him. After relating his findings, Dr. Kiell opined that,
Obviously, he had a herniated disk, complaints and signs were consistent with a lumbosacral radiculopathy that were more marked on the left. Also he's on tranquilizers and antidepressants so that I felt that that masked somewhat the clinical findings but he's depressed in terms of his verbalization, in terms of the findings. Signs and symptoms are also of chronic pain syndrome, that is a person struggling with pain, they're irritable, they're tense, they're worried. He's fearful of further surgery ...
* * * * * * * *
I estimated neurological disability at 60 percent of total. I estimated permanent neuropsychiatric disability at 30 percent to total. These are exclusive of the orthopedic.
The second expert witness was Dr. Earl C. Shaw, not an orthopedist but a specialist in "traumatology and sports medicine." Dr. Shaw examined petitioner on February 13, 1987. His diagnosis was,
Low back derangement with herniated disk at the L4-5 level with degenerative disk disease at the L5-S1 level with central spur encroaching upon the sac and left nerve root with bilateral sciatic neuritis.
Dr. Shaw also stated that it was reasonable for Lister to have sought treatment on his own based on his fear of the proposed surgery. The doctor concluded that petitioner "appeared to be totally disabled" from an orthopedic viewpoint. That is, Lister would not be able to go back to work as a truck driver nor would he be able to fill a job which required him to stand on his feet all day or to sit for any length of time:
The basis for that opinion is the findings that were made in the body of my report, the functional restrictions that this man has in his lower back area as evidenced by my examination, the changes that have occurred in the muscular *69 structures of the lower back, the changes that have occurred in relationship to the vertebral bodies as well as the findings made on the CAT scan.
The final witness to testify on behalf of petitioner was Edmond A. Provder, an expert in the field of vocational training, who evaluated petitioner at his office on June 10, 1987, also without the benefit of any interpreter. He secured a history, read the medical reports and administered a battery of "standardized tests" in order to assess the effect of the physical and mental impairments on his ability to engage in competitive employment. He opined:
Based on my evaluation of Mr. Lister, it's my opinion that he demonstrates significant vocational handicaps which impede his ability to sit, stand, walk, lift and carry.
In addition, based on my evaluation of him, the result of the evaluation and the conclusions I made as well as his age, his education, past work experience, it's also my opinion that based on all these factors he would be unable to perform any of his past relevant work or transfer his skills to other types of semi-skilled occupations.
In addition, its my opinion he would be unable to perform any sedentary, light, medium or heavy work existing in the local or national economy on a sustained, regular competitive basis. It's my opinion he is unemployable for any job existing in the competitive labor market.
Finally, Provder testified that based on Lister's "present condition," he could not be rehabilitated to allow him to work in the future.
Respondent's case proceeded with testimony first from Dr. William A. Loeb, a board certified orthopedist "in the field of trauma." He examined Lister on April 6, 1987 at which time he took a history. After explaining the results of that examination and agreeing with the diagnosis of a herniated disc, Dr. Loeb estimated petitioner's disability orthopedically as, "12 1/2 percent partial total." He indicated that he would recommend that Lister undergo surgery therefor because "he's an excellent candidate." He further opined that petitioner is capable of some type of gainful employment even without such medical intervention. Specifically, he stated that petitioner is able to participate in "a non-laborious, sedentary type of work where he could certainly be productive to a reasonable extent" and gave specific examples of such jobs. However, Dr. Loeb *70 agreed that the present orthopedic injuries do impose significant limitations on petitioner's ability to bend his back.
The next expert witness to testify for respondent was Dr. Abraham S. Effron, a board certified neurologist and psychiatrist. He had examined petitioner in April 1987 and his opinion of petitioner's disability was expressed thus:
Based upon the present data with reference to the incident of December 3, 1985, I would recommend a permanent neuropsychiatric disability of four percent of partial total which would be equally divided between neurological and psychiatric aspects of this condition.
Contrary to the other doctors' opinions, however, he diagnosed petitioner as having a low back derangement with only the "possibility" of a herniated disc. Dr. Effron opined that petitioner suffered from only a mild depressive condition and believed he could work, and
would not recommend he do heavy work, but he can do lifting up to 30, 35 pounds; he can do security work; he can do sedentary work; he can be a dispatcher. I'm talking in terms of things within his job at the time of the accident. He can run an elevator, for example.
Further, Dr. Effron did not believe that Dr. Marchese's future treatment was necessary since he did not think that petitioner is depressed to such an extent as to require it. In fact, his belief was that petitioner did not want to work because it was attractive not to do so from a financial standpoint.
Philip D. Orsi, respondent's vocational consultant, met with Lister on approximately three occasions for an evaluation and conducted his interviews in English. He also administered vocational tests which included work samples which disabled persons perform in actual jobs. Mr. Orsi concluded that there are some selective jobs which petitioner could do in his present condition and cited some examples of those positions. He also explained that,
Those particular jobs would be sedentary, definitely sedentary jobs that would require or allow for alternating of sitting and standing. When a person is feeling pressure and all, there's a number of companies that will allow the person to get up and stretch, walk around or the nature of the task would require that.
*71 He also felt that Lister is not motivated to work because of his ethnic background and work ethic but that proper vocational counselling could change this. Finally, he stated that work related activity would help the petitioner and that he is still young enough to be retrained, given some improvement in his physical condition. On cross-examination, he acknowledged that petitioner did have difficulty in speaking English to him.
On June 21, 1988 the workers' compensation judge dictated a 50-page oral opinion into the record. In the first 44 pages thereof, however, he merely read, verbatim, the hypothetical question utilized by petitioner at trial which he felt "contains the essential facts" and undertook to summarize the testimony adduced from the various witnesses. He then ruled in favor of petitioner by concluding:
After carefully considering the sworn testimony of the petitioner and the various experts, and having an opportunity to observe them for credibility, I find that the petitioner has sustained the burden of proof by the weight of the credible evidence adduced before me.
I accept the opinions of Dr. Kiell; Dr. Shaw; and Mr. Provder; the employment expert, and conclude that the petitioner is totally and permanently disabled and unemployable in the open labor market.
I find this from the physiological standpoint.
However, together with the `Odd Lot Doctrine' Application, this petitioner would be totally and permanently disabled and unemployable in the open labor market.
I reject the conclusions, and especially the estimates of Dr. Loeb and Dr. Effron.
I fix the date that total permanent disability begins to be February the 26th, 1986.
This is the day after the last payment of temporary disability benefits, which date was fixed by the testimony of the respondent's doctor, Dr. Loeb.
He conditioned the award of permanent disability by making it
subject to the provisions of [N.J.S.A. 34:15] Paragraph 12(b) requiring that the petitioner be certified by the New Jersey Rehabilitation Commission that he is still totally and permanently disabled and unemployable in the open labor market.
A month later, in an amended decision, he ordered respondent to pay all petitioner's past and future medical expenses including the bills rendered by Dr. Margolies, Dr. Marchese, St. Joseph's hospital as well as the pharmaceutical bills.
*72 On this appeal respondent contends that the workers' compensation judgment is deficient because it is based on a decision which is not supported by articulated reasons nor is it grounded in credible evidence. It further contends that the determination of total disability based on the application of the odd-lot doctrine is likewise erroneous and, lastly, that the judge failed to determine that the unauthorized medical bills incurred were necessary and reasonable.
Petitioner responds by asserting that the decision is proper in all respects when tested against the standard set forth in Close v. Kordulak Brothers, 44 N.J. 589 (1965) which requires that:
[T]he standard to govern appellate intervention . .. is ... `whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering `the proofs as a whole,' with due regard to the opportunity of the one who heard the witness to judge of their credibility ... and, in the case of agency review, with due regard also to the agency's expertise where such expertise is a pertinent factor. [Id. at 597 (citing State v. Johnson, 42 N.J. 146, 162 (1964)).]
See also DeAngelo v. Alsan Masons, Inc., 122 N.J. Super. 88, 89-90 (App.Div. 1973), aff'd 62 N.J. 581 (1973).
Basically, petitioner bears the burden of proving the elements of his case by a preponderance of the probabilities. Dwyer v. Ford Motor Co., 36 N.J. 487, 493-494 (1962); Page v. Federated Metals Div., 71 N.J. Super. 59, 61 (App.Div. 1961) certif. den. 38 N.J. 302 (1962). The standard is one of reasonable probability; i.e., whether or not the evidence is of sufficient quality to generate a belief that the tendered hypothesis is in all likelihood the truth. The evidence must be such as to lead a reasonably cautious mind to the given conclusion. "It need not have the attribute of certainty, but it must be well founded in reason and logic; mere guess or conjecture is not a substitute for legal proof." Ciuba v. Irvington Varnish and Insulator Co., 27 N.J. 127, 139 (1958). Further, the award of compensation must be based upon a claimant's disability at the time of the determination. DiCostanzo v. Matthews Const. Co., 110 N.J. Super. 383, 389 (App.Div. 1970) aff'd 58 N.J. 159 (1971).
*73 However, when an administrative body renders a decision and fails to make adequate findings of fact and give an expression of reasoning which, when applied to the found facts, led to the conclusion below, the decision cannot stand. In N.J. Bell Tel. Co. v. Communications Workers of America, 5 N.J. 354 (1950), the Court stated:
It has been said that it is a fundamental of fair play that an administrative judge express a reasoned conclusion.... A conclusion requires evidence to support it and findings of appropriate definiteness to express it. [Id. at 375 (citation omitted).]
And the findings must be:
... sufficiently specific under the circumstances of the particular case to enable the reviewing court to intelligently review an administrative decision and ascertain if the facts upon which the order is based afford a reasonable basis for such order. [Id. at 377.]
See also Van Realty, Inc. v. City of Passaic, 117 N.J. Super. 425, 430-431 (App.Div. 1971).
Thus, a mere cataloging of evidence followed by an ultimate conclusion of liability, without a reasoned explanation based on specific findings of basic facts, does not satisfy the requirements of the adjudicatory process because it does not enable us to properly perform our review function within the guidelines of Close, supra. Oszmanski v. Bergen Point Brass Foundry, Inc., 95 N.J. Super. 92, 95 (App.Div. 1967), certif. den. 51 N.J. 181 (1968). In Benjamin Moore & Co. v. City of Newark, 133 N.J. Super. 427, 429 (App.Div. 1975) we reiterated that warning. See also St. Vincent's Hospital v. Finley, 154 N.J. Super. 24, 31 (App.Div. 1977).
In Smith v. E.T.L. Enterprises, 155 N.J. Super. 343 (App.Div. 1978) we criticized an attempt by a workers' compensation judge to discharge his obligation in such a conclusionary fashion, and noted that our Supreme Court had previously warned agencies:
It is axiomatic in this State by this time that an administrative agency acting quasi-judicially must set forth basic findings of fact, supported by the evidence and supporting the ultimate conclusions and final determination, for the salutary purpose of informing the interested parties and any reviewing tribunal of the basis on which the final decision was reached so that it may be readily *74 determined whether the result is sufficiently and soundly grounded or derives from arbitrary, capricious or extra-legal considerations. [Smith, 155 N.J. Super. at 348 (quoting Application of Howard Savings Institution of Newark, 32 N.J. 29, 52 (1960) (citations omitted).]
See also Lewicki v. N.J. Art Foundry, 88 N.J. 75, 89-90 (1981) (although Workers' Compensation judges are regarded as experts and their findings are entitled to deference, such findings must be supported by articulated reasons, grounded in the evidence); Goldklang v. Metropolitan Life, 130 N.J. Super. 307, 311 (App.Div. 1974); aff'd 66 N.J. 7 (1974). Cf. Perez v. Pantasote, Inc., 95 N.J. 105, 118-120 (1984).
In this case, given the extended period over which this trial took place, it is hardly surprising that the judge found it necessary to engage in a complete recitation of the evidence, prompted, we suspect, as much by the desire to refresh his recollection as for any other reason. Notwithstanding that, however, in reading the "decision" we find that we are treated only to a "cataloging" or rehashing of the evidence. No specific reasons are given to indicate why the judge, in the absence of any testimony from treating physicians, chose to accept the testimony of the petitioner's forensic witness over respondent's witnesses. Cf. Bober v. Independent Plating Corp., 28 N.J. 160, 167 (1958). Thus, we are left to speculate as to the bases for the compensation judge's conclusions.
Likewise, there are no findings addressed to petitioner's asserted difficulty in communicating in English. Such difficulty may or may not have impacted on his ability to communicate during the various examinations conducted by the six experts. The importance of this consideration is emphasized by the fact that he found it necessary to use an interpreter to help him testify at trial.
Additionally, petitioner also elected to rely upon the "odd-lot" doctrine of total disability, presumably at the last minute because his petition was based on the assertion that he was totally and permanently medically disabled. See N.J.S.A. 34:15-12b and 34:15-36. Parenthetically, we note that when a *75 petitioner relies on the odd-lot doctrine in order to establish total permanent disability, the pretrial memorandum should indicate such reliance in order to alert the respondent and so that the burden of proof attendant upon that reliance will be properly allocated, although respondent has no such complaint in this case. Germain v. Cool-Rite Corp., 70 N.J. 1, 10 (1976). Here, the judge specifically determined total disability in petitioner's favor in rendering the award on both bases. Cf. Kovach v. General Motors Corp., 151 N.J. Super. 546, 552-553 (App.Div. 1977). Again, however, we find no articulation of the factors which necessarily apply to that doctrine.
Briefly stated, under the odd-lot doctrine, total disability may be based on factors other than purely medical ones. Barbato v. Alsan Masonry, 64 N.J. 514, 521 (1974). Thus, if the total picture indicates that a person is rendered totally disabled by the work-related injury based on "such factors as physical condition, age, education, training, background, post-accidental neurological and emotional condition and the great unlikelihood of his finding new employment, absent a charitable employer," such a determination will be upheld. Oglesby v. American Dredging Co., 64 N.J. 538, 547-548 (1974). In this regard, our Supreme Court has stated:
The ability to perform limited service in ones own or a family enterprise may not of itself be sufficient to negate industrial unemployability. The question in that kind of situation is the workers' [sic] ability to sell his services in a competitive job market. Ability "for `light' or intermittent work or labor is not inconsistent with total incapacity." [Germain v. Cool-Rite Corp., supra, at 8 (citations omitted)].
In other words, "... total disability is a combined law and fact question" under the odd-lot doctrine. Barbato, supra, 64 N.J. at 530. "Hence, where the employer contends that the employee is less than 100% disabled, it is incumbent upon the employer to show that work within the capacity of such employee is, in fact, within reach." Id. at 529 (emphasis in original). The decision here is devoid of any discussion of these issues. Accordingly, we are constrained to reverse also because of the inadequacy of the basis for the adjudication of total disability *76 on that basis. See Zabita v. Chatham Shop Rite Inc., 208 N.J. Super. 215 (App.Div. 1986).
Additionally, while not raised specifically by respondent on this appeal, the judge also failed to address the issue of petitioner's refusal to undergo the recommended further medical treatment and vocational counseling. This subject was raised at trial during the interrogation of the various witnesses and should have been dealt with in the decision. We caution, however, that our courts generally have held that a worker is not required to submit to a surgical procedure such as that suggested by the evidence here. See Kalson v. Star Elec. Motor Co., 15 N.J. Super., 565, 572 (Cty.Ct. 1951), aff'd o.b. 21 N.J. Super. 15 (App.Div. 1952); Simpson v. New Jersey Stone & Tile Co., 93 N.J.L. 250 (E. & A. 1919); McNally v. Hudson & Manhattan R.R. Co., 87 N.J.L. 455, 456-458 (Sup.Ct. 1915), aff'd 88 N.J.L. 725 (E. & A. 1916); Feldman v. Braunstein, 87 N.J.L. 20 (Sup.Ct. 1915). Cf. 1 Larson, Workmen's Compensation Law, § 13.22 (1984).
Finally, we address the troublesome issue of the fragmentation of the trial of this matter over such an extended period of time without any apparent reason. Cf. N.J.S.A. 34:15-53.
The claim petition upon which the judgment entered was filed on May 3, 1986. The trial did not commence until May 21, 1987 at which time only Lister's direct testimony was received through an interpreter. The matter was then adjourned until June 11, 1987 when his cross-examination took place, again through an interpreter. On September 3, 1987, Doctors Kiell and Shaw, petitioner's two experts, testified. Then the matter was carried until January 28, 1988 at which time his expert employment counsellor testified, and petitioner rested. Respondent's case did not start until March 10, 1988. On that date, only one of its expert doctors appeared. Thereafter, it was adjourned until April 21, 1988 when the second doctor testified. Finally, on May 12, 1988 respondent's vocational rehabilitation expert testified and the judge specifically reserved decision *77 (although respondent was granted permission to produce records of petitioner's prior accidents and make them part of the record). On June 21, 1988 the judge orally placed his decision on the record in counsels' absence and apparently without hearing any closing remarks from the attorneys. On July 19, 1988 he supplemented that decision in respect of the payment of certain medical benefits by respondent, again in the absence of counsel. Judgment was finally entered on August 10, 1988, awarding Lister "100% total permanent disability orthopedic, neurologic and neuropsychiatric for low back permanent with herniated disc...."
We have noted the trend toward trying workers' compensation cases in this interrupted manner over extended periods of time without any demonstration or hint of good cause and we take this opportunity to express our disapproval thereof. Cf. Hajnas v. Engelhard Min. & Chem. Co., 231 N.J. Super. 353, 355, n. 2 (App.Div. 1989). Without any cause attributable to the needs of the witnesses, litigants, attorneys or the court itself, such protraction results in an inexcusable delay in the disposition of the claim. This simply increases the need for copious notes or the furnishing of an expensive transcript of the previous proceedings. Further, it increases the obvious probability that lapses of memory, so important to the assessment of credibility based on the demeanor of the witnesses, may affect the outcome. Margaritondo v. Stauffer Chemical Co., 217 N.J. Super. 560 (App.Div. 1985), cause remanded, 104 N.J. 388 (1986), on remand, 217 N.J. Super. 565 (App.Div. 1986).
It is settled beyond dispute that the objective of our Workers' Compensation Act is to provide prompt payment for a worker's injuries with a minimum of litigation. Lane v. Universal Stevedoring Co., 63 N.J. 20, 34 (1973). A quick and efficient remedy should be achieved. Electronic Associates, Inc. v. Heisinger, 111 N.J. Super. 15, 19-20 (App.Div. 1970). To this end certain regulatory rules have been promulgated in order to encourage such prompt dispositions in the Division of Workers' Compensation which have been set forth in N.J.A.C. 12:235. *78 By their very terms, they are designed "to secure a just determination, simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." N.J.A.C. 12:235-1.5. Accordingly, they require that
[T]rials shall continue, without interruption or adjournment, except where the judge of compensation, upon his own motion, or upon application of either party shall for good cause continue the hearing to an adjourned date. [N.J.A.C. 12:235-5.10(e)].
Further,
[A]ll reserved decisions shall be rendered within 15 days from completion of the last day of hearing or within 15 days from the date of filing of briefs. Additional time to render reserved decision may be allowed only on approval of a written application to the director [of the Division]." [N.J.A.C. 12:235-5.10(r)]
These requirements were not followed in this case and in others which we have encountered. See, e.g., Hajnas v. Engelhard Min. & Chem. Co., supra. Suffice it to say that the regulations are presumed to be valid, binding and workable. If not, it is the Director who should change them in the manner and within the parameters allowed by law. Cf. N.J.S.A. 34:15-53. Absent such modification, however, they should be adhered to scrupulously in the future.
Finally, in light of the remand we do not find it necessary to address the issue raised regarding the necessity and reasonableness of the unauthorized medical treatment, which may be pursued there. Cf. N.J.S.A. 34:15-15.
Accordingly, we reverse and remand to the Division for specific findings and an expression of the judge's reasoning consistent with the comments set forth herein. Because we believe that the parties may desire to produce additional evidence on the issue of petitioner's refusal to accept the medical or vocational modalities treatment suggested in the record we do not retain jurisdiction. Zabita v. Chatham Shop Rite Inc., supra, 208 N.J. Super. at 224. In this way supplemental evidence may be received and a reasoned decision made with respect thereto.
Reversed and remanded.
NOTES
[1] We have not been furnished with all of the exhibits marked into evidence at the trial which would have assisted us in determining the full and proper names of the persons involved, and the like. For example the Goulart name is spelled differently at various points in the record. Cf. R. 2:6-1(a)(8).