**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3787-19

MICHAEL COPPOLA, a/k/a
MICHAEL CAPPOLA,

      Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____

Argued December 14, 2021 – Decided January 19, 2022

Before Judges Haas and Mitterhoff.

On appeal from the New Jersey Department of Corrections.

John Vincent Saykanic argued the cause for appellant.

Daniel S. Shehata, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Daniel S. Shehata, on the brief).

PER CURIAM

Petitioner Michael Coppola, an inmate at Bay State Prison, appeals from a May 6, 2020 final agency decision of the New Jersey Department of Corrections (DOC), which upheld an adjudication and sanctions for committing prohibited act *.252, encouraging others to riot, N.J.A.C. 10A:4-4.1(a). Recently, another panel of this court decided a related matter arising from the same facts and circumstances.[1]  For substantially the same reasons as our colleagues, we vacate the determination and remand for further proceedings.

Coppola's charge arises from an incident that occurred when he was an inmate at Southern State Correctional Facility (SSCF).  In April 2020, Housing Unit 2-Right at SSCF (Unit 2R) was designated as a "quarantine unit" for the temporary housing of inmates who had been in close contact with an inmate or staff member who was symptomatic with COVID-19.  On April 9, 2020, SSCF custody staff were tasked with moving thirty-five inmates from three housing wings into Unit 2R.  The first two groups were moved into Unit 2R without

---

[1]  Alex Rosa v. New Jersey Department of Corrections, No. A-4010-19 (App. Div. Dec. 20, 2021).

incident. Coppola was a member of this initial group and was transferred from Unit 8R to 2R without incident.

At around 9:20 p.m., as the final group of twelve inmates were being processed into 2R, the sixty-three inmates already in Unit 2R entered the Unit's day-space and began yelling, cursing, and demanding that no additional inmates be housed on the unit. The Unit 2R inmates also threatened the twelve inmates entering the Unit, telling them to not enter the Unit, and were yelling to each other not to allow anyone onto the Unit.

At 9:30 p.m., SSCF officers temporarily removed the twelve inmates and the institutional "Lock-up" was called for the entire facility in order to facilitate a count of the inmates and to place them in their cells for the night. Despite the call for "Lock-up," the inmates on Unit 2R refused several orders to leave the day-space and report to their wings for the inmate count and continued watching TV, using the kiosks, and remaining on the telephones. At approximately 9:40 pm, several unidentified inmates pushed a table up against the tier gate in an attempt to create a barricade and prevent anyone else from entering. At this time, Lt. Trevor Ernest of SSCF arrived on the Unit and advised all inmates housed in Unit 2R that if they were not participating in the refusal to stand count,

3

they were to return to their wings and remain on their bunks. None of the inmates, however, returned to their bunks as ordered.

At 10:00 p.m., Major Floyd Cossaboon arrived at SSCF and monitored Unit 2R in real-time via security cameras. He "observed inmates from every wing milling about the unit. There were no wings that were not participating in their refusal to leave the day space and 'count-up.'" He also observed inmates from all six housing wings moving in and out of the day-space, and observed inmates huddled in a bathroom. Many of the inmates were wearing surgical masks or altered clothing items to cover their faces, and therefore could not be identified.

Due to the prolonged defiance of orders by the inmates, the Department of Correction's Special Operations Group (SOG) and K-9 Unit were activated and dispatched to SSCF to quell the disturbance. By 3:30 a.m. on April 10, all sixty-three inmates from Unit 2R were identified, processed, and transported to a quarantine unit at South Woods State Prison.

Coppola maintains that he did not participate in the disturbance. He states that, after being moved to Unit 2R, he was unpacking his belongings and making his bed when he "heard a commotion at some point and went out to the day space to see a table pushed up to the entrance gate." He states that when the

A-3787-19

disturbance began, he walked around to find out what was happening, and noted that "most people were scared and panicked." Coppola went to the kiosk and at 9:38 sent an email to Administrator Erin Nardelli which stated:

> Attn Erin Nardelli.[] Last night my entire wing from unit 8 got moved here to unit 2. We have some pressing issues. First we would like confirmation that we will be put back in population after 14 days with no symptoms. Next, Unit 8 ordered commissary [W]ednesday and are due to [receive] on [M]onday. We from unit 8 who[] just got moved here request that you please have commissary process our order and deliver it to unit 2. I am afraid this is [p]aramount as we have no food but what they give us. Please have mercy. I know things are messy now and you are reacting to this as best you can but please come visit me here in unit 2 [I will] see you through the gate, I really need to talk to you. It is too crowded in here and [there is] no [air conditioning] on and [it is] hot. People are very scared and worried here. Also we need more fresh air outside one hour is crazy. I am certain we can work these thing[s] out. PLEASE COME SEE ME. Thank you. . . .

Coppola maintains that after he sent the email, he returned to his bunk "where I belonged." He states that he was on his bunk when SOG arrived. Finally, Coppola contends that on April 9, 2020, at approximately 9:00 p.m., he is visible on camera in D wing on his bunk, and that he only left his bunk to see what was happening and to try to talk to people. He further states that he used the kiosk

5

to ask for help and denies he ever did anything to encourage a riot. Coppola asserts that the video evidence clears him of any wrongdoing.

Coppola was charged with committing prohibited act *.252. On April 11, 2020 a Corrections Sergeant served the charge on him, conducted an investigation, and referred the charge to a hearing officer for further action. Coppola's hearing occurred on April 30, 2020 after several postponements stemming from his requests to take a polygraph, for confrontation of officers, and to allow the hearing officer to review the record. He requested, and was granted, the assistance of a counsel substitute and pleaded "not guilty" to the charge.

Coppola's request for confrontation with Officers Russo and Valentine,[2] and Lt. Ernest, was also granted. At the hearing, he acknowledged that he was among the sixty-three inmates housed on Unit 2R during the disturbance.

At the conclusion of the hearing, Disciplinary Hearing Officer J. Zimmerman found Coppola guilty of the charge. He was sanctioned to 210 days' administrative segregation, 90 days' loss of communication time, and 10 days'

---

[2] The record before us does not provide the full names of Officers Russo and Valentine, so their first names have been omitted from this opinion.

loss of recreation privileges. In making his determination, the hearing officer noted:

> 1. [Coppola] was part of a group that received orders (PA system announced Count up at 9:30)
>
> 2. The orders were of such a nature that any reasonable person would have understood the orders ([inmates] were given several orders from officers and [the lieutenant] to go down to their wings)
>
> 3. The orders were loud enough that the entire group could have heard the orders
>
> 4. [Coppola] had ample time to comply with the orders
>
> 5. No [inmates], after receiving warnings complied with staff orders (video shows [inmates] did not disperse)
>
> 6. [Coppola] was part of the group as evidence by the escort reports (see A5; 33 reports)
>
> The above [six] findings, in addition to the evidence noted above, support that [Coppola] encouraged others to riot. A reasonable person would believe that [Coppola's] actions and the actions of the group as a whole reach a level to determine guilt of the charge written.

He further noted:

> [p]lease note, no evidence of mental health problems. Sanction to deter [inmates] from encouraging others to riot and to promote a safe and secure facility. [Inmate's] behavior could have led to violence and injuries for staff and other [inmates]. Orders are

7

A-3787-19

mandatory and must be followed immediately. [Inmate's] actions caused SOG, the K-9 Unit, and Central Transportation to be dispatched and mass overtime to be accrued as the entire second shift was mandatorily ordered to stay on duty for this incident. [Inmate's] behaviors cannot be tolerated and any future behavior of this type must be deterred for safety and security purposes. DHO notes [inmate] has no disciplinary history. Leniency shown as inmate was not sanctioned to the max sanctions allowed per 10 A for a Category A Offense.

Coppola filed an administrative appeal, relying on his written statements submitted at the hearing. On May 12, 2020, Associate Administrator Michael Ridgeway upheld the guilty finding and the sanctions.

On June 13, 2020, Coppola filed this appeal. On October 9, 2020, the Attorney General's Office filed the Statement of Items comprising the record (SICR). On October 14, 2021, the Attorney General's Office sent Coppola's attorney all of the items contained in the SICR. On February 26, 2021, Coppola filed a motion to supplement the record to include the video evidence and the email communication. On April 9, 2021, the court granted Coppola's motion to supplement the record by allowing the record to include the email communication.

Petitioner presents the following arguments for our consideration:

POINT I

THE FINAL AGENCY DECISION OF THE NJDOC SHOULD BE REVERSED AND VACATED AS IT WAS "ARBITRARY, CAPRICIOUS, OR UNREASONABLE" AND LACKED FAIR SUPPORT IN THE EVIDENCE AS MR. COPPOLA IS INNOCENT OF THE DISCIPLINARY CHARGE OF *.252 (ENCOURAGING OTHERS TO RIOT); THERE WAS, IN FACT, NO "RIOT" AND MR. COPPOLA DID NOTHING UNTOWARD DURING THE ENTIRE INCIDENT.

POINT II

THE FINAL AGENCY DECISION OF THE NEW JERSEY DEPARTMENT OF CORRECTIONS (NJDOC) SHOULD BE REVERSED AND VACATED DUE TO THE FAILURE OF THE NJDOC TO PROVIDE MR. COPPOLA WITH THE EVIDENCE AGAINST HIM PRIOR TO THE DISCIPLINARY HEARING; SPECIFICALLY, HIS VIEWING OF THE SURVEILLANCE VIDEOS AND THE PRODUCTION OF HIS J-PAY COMMUNICATIONS WITH ADMINISTRATION.

POINT III

THE FINAL AGENCY DECISION OF THE NEW JERSEY DEPARTMENT OF CORRECTIONS (NJDOC) SHOULD BE REVERSED AND VACATED DUE TO THE FAILURE [] OF THE NJDOC TO GRANT MR. COPPOLA'S REQUEST FOR A POLYGRAPH EXAMINIATION.

Our scope of review of an agency decision is limited. In re Stallworth, 208 N.J. 182, 194 (2011). "We defer to an agency decision and do not reverse

unless it is arbitrary, capricious[,] or unreasonable or not supported by substantial credible evidence in the record." Jenkins v. N.J. Dep't of Corr., 412 N.J. Super. 243, 259 (App. Div. 2010) (citing Bailey v. Bd. of Rev., 339 N.J. Super. 29, 33 (App. Div. 2001)).

We have long recognized that "[p]risons are dangerous places and the courts must afford appropriate deference and flexibility to administrators trying to manage this volatile environment." Russo v. N.J. Dep't of Corr., 324 N.J. Super. 576, 584 (App. Div. 1999). A reviewing court "may not substitute its own judgment for the agency's, even though the court might have reached a different result." Stallworth, 208 N.J. at 194 (quoting In re Carter, 191 N.J. 474, 483 (2007)). "This is particularly true when the issue under review is directed to the agency's special 'expertise and superior knowledge of a particular field.'" Id. at 195 (quoting In re Herrmann, 192 N.J. 19, 28 (2007)).

But our review is not "perfunctory[,]" nor is "our function . . . merely [to] rubberstamp an agency decision[.]" Figueroa v. N.J. Dep't of Corr., 414 N.J. Super. 186. 191 (App. Div. 2010). Instead, "our function is 'to engage in a careful and principled consideration of the agency record and findings.'" Ibid. (quoting Williams v. Dep't of Corr., 330 N.J. Super. 197, 204 (App. Div. 2000)). A hearing officer's findings must be "sufficiently specific under the

circumstances of the particular case to enable the reviewing court to intelligently review an administrative decision and ascertain if the facts upon which the order is based afford a reasonable basis for such an order." Lister v. J.B. Eurell Co., 234 N.J. Super. 64, 73 (App. Div. 1989) (quoting In N.J. Bell Tel. Co. v. Commc'ns Workers of Am., 5 N.J. 354, 377 (1950)). It is also well settled that an agency's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995).

Pursuant to N.J.A.C. 10A:4-4.1(a):

> An inmate who commits one or more . . . numbered prohibited acts shall be subject to disciplinary action and a sanction that is imposed by a Disciplinary Hearing Officer . . . . Prohibited acts preceded by an asterisk (*) are considered the most serious and result in the most severe sanctions . . . . Prohibited Acts are further subclassified into six categories of severity (Category A through F) with Category A being the most severe and Category E the least severe and Category F containing an opportunity for inmates found guilty of specified infractions to participate in a substance-use disorder treatment program . . . , if eligible. . . .[3]

---

[3] Under the version of N.J.A.C. 10A:4-4.1(a) in effect at the time of the April 9, incident, Category F did not exist, and a finding of guilt for a Category A offense, such as prohibited act *.252, carried with it "a sanction of no less than 181 days and no more than 365 days of administrative segregation per incident." N.J.A.C. 10A:4-4.1(a) (2017). The range of sanctions under N.J.A.C. 10A:4-4.1(a) was amended in 2021 so that now,

To find an inmate guilty of a prohibited act under N.J.A.C. 10A:4-4.1, a hearing officer must have substantial evidence of an inmate's guilt. N.J.A.C. 10A:4-9.15(a). "'Substantial evidence' means 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Figueroa, 414 N.J. Super. at 192 (quoting In re Pub. Serv. Elec. & Gas Co., 35 N.J. 358, 376 (1961)).

Like our colleagues, we conclude that DOC's decision is not accompanied by the necessary findings of fact to establish that Coppola encouraged a riot. As a result, we remand this case to the DOC to address this deficiency.

After making certain factual findings, the hearing officer concluded that "[w]hile it is not known what each inmate's specific role was in the disturbance,"

> over [fifty percent] of the [inmates]. . . claimed to have been on their beds . . . . Credibility is voided as videos . . . show majority of [the inmates] congregating in the dayroom, disobeying rules and orders given. Although

---

> [a] finding of guilt for any offense in Category A may result in a sanction of five to [fifteen] days in an Adjustment Unit and up to 365 days in a Restorative Housing Unit (R.H.U.) per incident and one or more of the sanctions listed at N.J.A.C. 10A:4-5.1(e), unless a medical or mental health professional determines that the inmate is not appropriate for R.H.U. placement. Where a medical or mental health professional has made such a determination the inmate may receive one or more of the less restrictive sanctions listed at N.J.A.C. 10A:4-5.1(e).

there is no audio available on the videos, several reports confirm that [inmates] were making threats and encouraging others to riot.

Instead of specifically refuting Coppola's statements about what he was doing during the incident, the hearing officer stated:

> It should be noted that, an [inmate's] specific role in the disturbance is not relevant. Whether the [inmate] pushed the table against the gate himself, was walking back and forth from the wing to the dayroom, was on the phone or kiosk without permission, or was yelling and cursing at the staff and [other inmates], his behavior can be viewed as noncompliant and therefore part of the overall disturbance. <u>Any behavior that is not compliant with staff orders can be viewed as encouraging non-compliant behaviors from others</u>.
>
> [(emphasis added).]

We are also not confident that "any behavior that is not compliant with staff orders can be viewed as encouraging non-compliant behaviors from others" let alone "encouraging a riot," the charge against Coppola. Additionally, we do not believe that Coppola's actions of using the kiosk and sending emails to Administrator Nardelli rise to the level of inciting others to riot. DOC has not presented any evidence in the record that Coppola sent his email with the intent to extract concessions from Administrator Nardelli, nor has DOC introduced any evidence to suggest that other inmates were aware that Coppola was going to send this email on their behalf.

13

On remand, the hearing officer may consider whether there is a basis to charge Coppola with some other prohibited act (in which case he would be entitled to notice and a hearing to address the newly charged infraction, N.J.A.C. 10A:4-9.16), or whether proof of Coppola's guilt regarding any infraction is without basis. We note that Lieutenant Ernest stated when answering confrontation questions:

> Encouraging a riot exists whenever a group of inmates assaults any official, destroys state property, bands together to resist authority, refuses to return to their housing assignments, or causes an overt act which interferes with the orderly running of the institution or endangers the well[]being of any staff member or inmate. Additionally, the incident is uncontrollable by the staff on duty at the time the situation develops. A group demonstration exists whenever a group of inmates passively protest a cause of concern, none of the above criteria are met, and the incident is able to be controlled by staff on duty at the time the situation develops. Interfering with count exists when [one] or more inmates refuse to go to their assigned bed/cell/etc. to be counted when ordered to do so. Refusing to obey an order exists when an inmate purposely, knowingly, actively, physically, refuses to comply with a lawful order.

We do not ignore the distinctions set forth in Lieutenant Ernest's statement regarding the variety of acts that an inmate might commit which could be considered "non-compliant," yet fail to constitute a Category A infraction of "encouraging a riot." Indeed, as Lieutenant Ernest suggests, such acts might

14

include less serious offenses, such as those delineated in Category B of N.J.A.C. 10A:4-4.1, including prohibited acts: *256 (refusing to obey an order of any staff member); *.306 (conduct which disrupts or interferes with the security or orderly running of a correctional facility); and *.502 (interfering with the taking of count). N.J.A.C. 10A:4-4.1(a)(2).[4] Accordingly, on remand, we trust the hearing officer will carefully sift through the proofs presented and elicit any additional information deemed necessary to determine whether there is substantial evidence to conclude Coppola committed a given disciplinary infraction. We express no opinion regarding the outcome of those proceedings.

We conclude that Coppola's remaining arguments are without sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E). Vacated and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4] We acknowledge that at the time of the incident, offense *.256 was under Part D of the code. We further observe that, during this time, a violation of a Category B offense carried a sanction of "no less than 91 and no more than 180 days of administrative segregation per incident" as well as other sanctions set forth in N.J.A.C. 10A:4-5.1(g). N.J.A.C. 10A:4-4.1(a) (2017). On remand, the DOC should apply the version of the code that was in effect at the time of the incident.