127 N.J. Super. 507 (1973)
318 A.2d 25
BARRY ROSSNAGLE, PETITIONER-APPELLANT,
v.
BOB CAPRA AND SHELL OIL COMPANY, RESPONDENTS-APPELLEES. BARRY ROSSNAGLE, PETITIONER-APPELLANT,
v.
SHELL OIL COMPANY, RESPONDENT-APPELLEE.
Superior Court of New Jersey, Appellate Division.
Argued April 24, 1973.
Decided July 18, 1973.
Rehearing Denied September 4, 1973.
*509 Before Judges KOLOVSKY, MATTHEWS and CRAHAY.
Mr. Joseph D. Haggerty argued the cause for appellant.
Mr. Verling C. Enteman argued the cause for appellee Shell Oil Company.
*510 Messrs. Lawrie, Jennings and Buggeln, attorneys for appellee Bob Capra (Mr. Leigh E. Buggeln, of counsel).
The opinion of the court was delivered by MATTHEWS, J.A.D.
In this Workmen's Compensation appeal there is no dispute as to the facts surrounding the happening of the two accidents which occurred while petitioner was repairing motor vehicles. The sole issue at trial involved the question of whether petitioner was an employee of respondents Shell Oil Company (Shell) and Bob Capra (Capra) at the time of the first accident, and of Shell alone at the time of the second accident, rather than an independent contractor on both occasions. Petitioner sought to prove that he was merely the manager of the service station where the accidents occurred while the respondents attempted to show that he was an independent dealer-operator of the station which he leased for specified definite terms from Shell.
In February 1969, petitioner, a 26 year old with an eighth grade education, had been employed as a service station attendant by respondent Capra at his service station in Easton, Pa. While there employed he met and engaged in a conversation with Michael Barnes, a representative of Shell, who petitioner claimed, after several conversations, offered him a job as the "manager" of a Shell station in Phillipsburg, N.J. for which he would earn $150 per week plus commissions. Subsequent meetings were held at which Barnes, Capra and petitioner's brother, a "manager" of another Shell station, were all present and at which the arrangements for petitioner to work as a manager were confirmed. He was enrolled in and attended a Shell service station training school in Wayne for four weeks and was paid $80 per week plus 10 cents per mile travelling expenses.
Following completion of the training course, petitioner arrived on April 28, 1969 at the station in Phillipsburg to begin work. Capra, Barnes and one Roland Harris, who was associated with the E.K. Williams accounting firm, came *511 to the station and began discussing operations with him. He was instructed to sign several papers and was told that the station "had to go in his name" because Capra would not be permitted to have two Shell stations in his name. He acknowledged that the papers included among them a promissory note for stock and inventory, a lease and a dealership agreement. However, he claimed that he did not understand any of them and stated that he "just signed them to get it over with." Capra also signed some papers. However, petitioner stated that he did not "put up any money" for the station.
Petitioner then commenced operation of the service station. A representative of Shell came to the station for a couple of days to show him how to run the business. Barnes also came there every day for at least two weeks and gave certain directions as to the operation of the station, such as what type of uniform he was required to wear, and how the various Shell products were to be displayed. Petitioner operated the station for three weeks prior to the occurrence of the first accident but admitted that he never received the weekly salary of $150 plus commissions that he claimed he was promised.
The first accident occurred on May 16, 1969 when a motorcycle which petitioner was attempting to repair jammed its throttle and carried him out into the street where he was struck by a truck. While he was recuperating in the hospital after this accident, Barnes visited him there and told him that "everything was in his name" and that the station was his.
He returned to the station in November of 1969 and continued to work, although only to a very limited extent due to his injuries, until July 1, 1970 when the second accident occurred. On this occasion he fractured his hands when a tire which he had been repairing exploded. After his return to work following the first accident he "drew" a salary of $75 per week and he continued to earn that figure after the second accident.
*512 In describing his operation of the station, petitioner stated that the price of gasoline was set at a retail price determined by Shell and that Shell initiated promotional advertising campaigns to draw customers. He admitted that a sign had been made for the station which read "Barry's Shell" (petitioner's first name) which Barnes had ordered for him and for which Shell had paid. He stated that Barnes set the hours of operation for the station but that he had the right to hire and fire employees and also the right to order inventory. He admitted that he had the right to and actually did run the station as he desired except as noted and that he had complete control of the premises and equipment at the station. If a customer wanted to have repairs done on a car, he decided whether or not the customer would be allowed to "charge" the costs of the repairs. Further, he procured a gasoline dealer's license and sales tax certificate in his name which were handled by E.K. Williams, the accounting firm that Barnes had suggested to him. He maintained the daily books and records which were occasionally checked by Capra. He maintained a bank account in the name of Barry's Shell, on which only he and his brother were authorized to draw checks. A personal income tax return listing his income from the business, and other documents such as sales tax forms and unincorporated business tax returns were all filed on his behalf by the accountants. He had also taken out a workmen's compensation insurance policy which covered his employees and which had been in effect ever since he commenced work in April 1969. Finally, petitioner stated that he paid the lease rental on the station out of his gas collections. He admitted that he was never paid any salary by Shell.
Capra gave a somewhat different version of the business arrangement among the parties. Although he admitted that in February 1969 he discussed with petitioner and Barnes the possibility of petitioner "managing" a second service station which he intended to lease, he claimed that at a subsequent meeting he informed Barnes and petitioner that he would not be able to take over another service station because of family *513 problems. Capra further stated that they then discussed the possibility of petitioner operating the station on his own. The specifics of the potential arrangement were that petitioner was to be the dealer of the station and that he would act as guarantor of petitioner's financial obligations to Shell arising out of the dealership. Capra stated that he had agreed to be guarantor for petitioner because he owed an "obligation" to petitioner's brother.
It was Capra's position that, other than serving as a guarantor, he never had any connection with the dealership arrangement between Shell and petitioner. He said he never participated in the profits of the business nor did he advance any cash for setting up the operation. He never ordered any inventory for the station or had any authority with respect to the hiring and firing of employees. He further claimed that although he occasionally visited the station to make sure that the "paper work" was being done, in order to protect himself from liability as a guarantor, petitioner did not report his weekly receipts to him.
Finally, Capra stated that at the time petitioner took over operations of the service station he knew of no agreement under which petitioner would be paid $150 per week plus commissions for managing the station.
Michael Barnes, who no longer is associated with Shell, was called as a witness in behalf of respondent Capra. He stated that at the time of the business arrangement in question he was a dealer representative for Shell. He too agreed that in February of 1969 a conversation took place wherein the possibility of petitioner becoming a manager of the Phillipsburg service station was discussed, but stated that an agreement to that effect was never consummated. After Capra advised him that he wouldn't be able to take over another Shell station because of family problems, a dinner meeting was held sometime subsequent to discuss the possibility of petitioner operating the station on his own. In addition to Barnes, the persons in attendance at that meeting were petitioner and his brother, Capra and Roland Harris from the E.K. Williams *514 accounting firm. It is not clear whether any definite agreement resulted from the meeting. However, a short time thereafter petitioner, with Barnes' assistance, filed an application for a Shell dealership. During either the first or second week of April 1969 Shell "favorably passed" on petitioner's application and it was thereby determined that he would take over the Phillipsburg station as a Shell dealer. The agreement was solely between petitioner and Shell; Capra was not involved. Barnes admitted that he "suggested" that petitioner retain the services of E.K. Williams as his accountants, but stated that petitioner was free to engage anyone he chose.
Among several documents admitted into evidence during the proceedings were: a "dealer lease" between Shell and petitioner for a term beginning May 1, 1969 and ending April 30, 1970; a promissory note in favor of Shell for $4,575 signed by petitioner and co-signed by Capra; a guaranty signed by Capra; a "dealer agreement" between petitioner and Shell dated April 28, 1969; a "dealer agreement" between petitioner and Shell dated May 1, 1970; and a "dealer lease" between petitioner and Shell covering a term from May 1, 1970 to April 30, 1973.
Both leases contain the following provision:
11. LESSEE'S BUSINESS. Nothing in this Lease shall be construed as reserving to Shell any right to exercise any control over or to direct in any respect the conduct or management of, the business or operations of Lessee on the Premises; but the entire control and direction of such business and operations shall be and remain in Lessee, subject only to Lessee's performance of the obligations of this Lease. Neither Lessee nor any person performing any duties or engaged in any work on the Premises at the request of Lessee shall be deemed an employee or agent of Shell.
The lease of April 28, 1969 provided:
2. TERM. The term of this Lease shall be a primary period beginning on May 1, 1969, and ending on April 30, 1970, and from year to year thereafter, but may be terminated by Lessee at any time by giving Shell at least 90 days' notice, and by Shell at the end of the *515 primary period or of any such subsequent year by giving Lessee at least 30 days' notice.
and that of May 1, 1970:
2. TERM. This Lease shall be in effect for the term beginning on May 1, 1970 and ending on April 30, 1973, but (a) may be terminated by Lessee at any time by giving Shell at least 90 days' notice, and (b) may be terminated by Shell by giving Lessee at least 30 days' notice, effective on the date when Lessee shall have been Shell's tenant of the Premises for twelve successive months (whether or not all under this Lease). In this Lease "month" always means calendar month.
Further, each lease provided, in paragraph 9, that Shell as lessor might terminate the lease in the event of specified defaults, the paragraph reading:
9. REMEDIES. If Lessee (a) defaults in payment of rent or any other indebtedness hereunder, or (b) defaults under article 8 or this article 9, or (c) defaults under any other provision of this Lease, and fails to remedy same within 15 days after Shell gives Lessee notice thereof (except that Lessee shall not be entitled to such notice and remedial period as to any default after the first one under any provision of article 5), or (d) enters bankruptcy or insolvency proceedings (voluntarily or otherwise) or makes an assignment for the benefit of creditors, or (e) dies, or (f) abandons the Premises or permits the service station to be closed for more than 72 successive hours: Shell may, at its option and without notice, terminate this Lease and reenter and repossess the Premises without prejudice to any other rights or remedies hereunder or by law. At any termination of this Lease, Lessee shall peaceably surrender possession of the Premises to Shell. As to any of Lessee's property which Lessee fails to remove from the Premises at termination of this Lease, Shell shall have the right to sell all or any part of same for Lessee's account on such terms as Shell may desire, but with the rights in Shell to apply the proceeds of such sale to the payment of any indebtedness of Lessee to Shell, whether under this Lease or otherwise, and to purchase any or all such personal property. All sums charged to Lessee by Shell under the provisions of this Lease shall be payable by Lessee to Shell on demand and shall bear interest therefrom at the rate of 6% per annum until paid. Lessee shall reimburse Shell on demand for all reasonable costs (including attorneys' fees) incurred by Shell in enforcing any of its rights or remedies hereunder. Both Shell and Lessee waive the right to trial by jury in any action or proceedings (including any counterclaim *516 therein) by either against the other arising out of or in connection with this Lease. Shell's right to require strict performance of Lessee's obligations hereunder shall not be affected by any previous waiver, forbearance or course of dealing.
Both dealer agreements (these were documents under which Shell agreed to provide its motor vehicle fuels and automotive lubricants to petitioner for resale, and petitioner agreed to purchase such products) contain provisions for their duration.
The agreement of April 28, 1969 provided:
2. PERIOD. This Agreement shall be in effect for a primary period beginning on May 1, 1969 and ending on April 30, 1970, and from year to year thereafter, but may be terminated by either Dealer or Shell at any time by giving the other at least 10 days' notice.
and that of May 1, 1970:
2. PERIOD. This Agreement shall be in effect for the period beginning on May 1, 1970 and ending on April 30, 1973, but (a) may be terminated by Dealer at any time by giving Shell at least 90 days' notice, and (b) may be terminated by Shell by giving Dealer at least 30 days' notice, effective on the date when Dealer shall have been Shell's tenant of Dealer's Station premises for twelve successive calendar months (whether or not all under Shell's present Lease thereof to Dealer).
The Judge of Compensation dismissed the petitions against both respondents finding that Capra had never entered into any agreement with either petitioner or Shell with respect to the Phillipsburg station, and that there was no evidence under which he could find that Shell was the employer of petitioner on either of the two days on which he suffered accidental injury.
Petitioner, in order to succeed in his claim, was required to prove by a preponderance of the evidence, among other things, that the accident arose "out of and in the course of his employment" with respondents. N.J.S.A. 34:15-7. The findings made below, that petitioner was not an employee of Capra and Shell at the time of the first accident and not *517 an employee of Shell at the time of the second accident, must be sustained by this court if they could reasonably have been reached on sufficient credible evidence present in the whole of the record. Close v. Kordulak Bros., 44 N.J. 589 (1965); DeAngelo v. Alsan Masons, Inc., 122 N.J. Super. 88, 89 (App. Div. 1973), aff'd 62 N.J. 581 (1973).
Two basic tssts have been employed by our courts in resolving whether an injured petitioner is an "employee" entitled to compensation or an "independent contractor" not so entitled. Generally, where a respondent has the right to exercise control over the means and methods by which the petitioner is to accomplish his work, an employer-employee relationship will be found. See Tofani v. Lo Biondo Brothers Motor Express, Inc., 83 N.J. Super. 480, 486-487 (App. Div. 1964), aff'd o.b. 43 N.J. 494 (1964). Where the "relative nature of the work" test is applied, the court will inquire into whether the work done by the petitioner was an integral part of the regular business of the respondent. If such is found then the court will determine that an employment relationship existed. See the dissenting opinion in Marcus v. Eastern Agricultural Assn, Inc., 58 N.J. Super. 584, 596 (App. Div. 1959) which the Supreme Court adopted in 32 N.J. 460 (1960). Cf. Caicco v. Toto Brothers, Inc., 62 N.J. 305 (1973).
We are satisfied from our review of the record that there is no evidence to demonstrate that Capra exercised any control over the operation of the station or that he in any way participated in the profits. His only business relation to petitioner was that of a guarantor for his financial obligations to Shell. Beyond occasionally stopping at the station to make such that the "paper work" was being done, Capra had no connection with the operation of the dealership. Although he admitted that at one time he had considered leasing the station and setting up petitioner as the "manager" thereof, this arrangement had to be abandoned because of certain family problems which he faced. It was hardly proven that petitioner was Capra's "manager" at the time that he *518 "took over" the station in April of 1969 or at the times of the separate accidents.
Resolution of the question of petitioner's relationship with respondent Shell is not without difficulty. Some guidance may be found in 1A Larson, Workmen's Compensation Law, § 44.35, p. 686:
[A]lthough the filling-station cases are among the most complex and evenly balanced, an analysis will show that the most reliable test that recurs in the decisions is the distinction between operators who have no lease and are subject to being "fired" on short notice, and operators who either have a lease or are secure in their contractual right to continue in the business for a specified time.
Professor Larson further states at p. 685-686:
In the filling-station cases, a close tie may be observed between the termination test and the furnishing-of-equipment test. If the operator occupies the premises only as a licensee from day to day, subject to cancellation of the arrangement on brief notice, he is like the truck driver to whom an expensive truck belonging to the employer has been entrusted. * * * On the other hand, if he occupies the premises under a bona fide lease of substantial length, and (which is the normal corollary) if the agreement cannot be cancelled at will, the premises, in the possessory sense, become his own. His duty to maintain them becomes that of a lessee rather than an employee, and the certainty that the contract will run a definite time enables the lessee to build up a business of his own with some assurance.
Although it is undisputed that petitioner and Shell entered into "dealer leases" for the operation of the Phillipsburg station, we question whether these leases can actually be regarded as "bona fide leases of substantial length." The first lease between petitioner and Shell, during the term of which petitioner incurred his first injury, ostensibly was for a period of one year commencing on May 1, 1969 and ending on April 30, 1970. The termination provision quoted above seems to provide that Shell could only terminate for cause under paragraph nine (quoted above) until the end of the initial term. However, it must be noted that the dealer agreement under which petitioner was to receive his "stock *519 in trade" and which ostensibly was also for a one year term, could have been terminated by Shell (or petitioner) at any time by the giving of 10 days notice. Conversely, the second lease, during the term of which petitioner sustained his second injury, which provided for a three year term, was terminable by Shell at any time on 30 days notice. The dealer agreement which accompanied the second lease which was also for a three year term could also be terminated by Shell on 30 days notice.
It is not difficult to see that petitioner had at best under his first "lease" a certain term of 10 days, and under his second "lease" a certain term of 30 days. With respect to the first lease, although Shell seems not to have had a right of termination (except for cause under paragraph nine), Shell could cut off petitioner from any supply of its products and leave him in a position of having a leased service station without anything to sell. Termination under clause nine would certainly follow quickly.
While a great deal of testimony was produced during the proceeding below which tended to show that petitioner had control over the leased premises, that same testimony demonstrated quite strongly that petitioner had reasonable control as long as Shell permitted him to have it. Shell always had the absolute right to terminate the flow of gasoline and oil to the station, under the first lease, on 10 days' notice and under the second lease, on 30 days' notice. Under those circumstances other elements of control delegated to petitioner could quickly become meaningless. As Judge Conford pointed out in his dissenting opinion in Marcus v. Eastern Agricultural Ass'n, Inc., 58 N.J. Super. 584 (App. Div. 1959), which was adopted by the Supreme Court as its opinion in 32 N.J. 460 (1960), since the purpose of workmen's compensation legislation is that the cost of all industrial accidents should be borne by the consumer as a part of the cost of the product (see 1A Larson, Workmen's Compensation Law, § 43.51, p. 633):
*520 It follows that any workers whose services form a regular and continuing part of the cost of that product, and whose method of operation is not such an independent business that it forms in itself a separate route through which his own costs of industrial accident can be channelled, is within the area of intended protection. [58 N.J. Super., at 603]
Finally, we find it to be of no significance that the injuries which petitioner sustained in each of the accidents occurred while he was doing repair work rather than pumping Shell gasoline or dispensing Shell oil products. The good will created through the service of repair work by a service station operator and those working under him benefit, at least indirectly, the supplier of the gasoline and oil products. See Bieluczyk v. Crown Petroleum Corporation, 134 Conn. 461, 58 A.2d 380 (1948).
We conclude from our review of the record for the reasons just expressed that the Judge of Compensation erred in determining that petitioner was an independent contractor and not an employee of respondent Shell.
The judgment of the Division of Workmen's Compensation is affirmed with respect to respondent Capra but is reversed with respect to respondent Shell and remanded for further proceedings to determine the quantum of the awards to be given petitioner.
The petition of respondent, Shell Oil Company (Shell), for rehearing is denied.
It is uncontradicted from the record in this case that, at all times pertinent to the litigation before us, both the petitioner, Rossnagle, and respondent, Shell, were of the view that, and acted on the assumption that, the petitioner's rights under the written dealer lease and dealer agreement were limited to those set forth in the writings.
Our conclusion that petitioner was an employee of Shell and not an independent contractor is not affected by the fact that on July 11, 1973, years after the accidents suffered by petitioner, the Supreme Court in two decisions, Shell Oil *521 Company v. Marinello, 63 N.J. 402, and Texaco Co. v. Appleget, 63 N.J. 411, ruled that, under a lease and dealer agreement similar to those here involved, the rights of the lessee-dealer extend beyond what appears on the face of the writings.