278 N.J. Super. 275 (1994)
650 A.2d 1025
MILTON PEREZ, PETITIONER-APPELLEE,
v.
MONMOUTH CABLE VISION, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 7, 1994.
Decided December 23, 1994.
*276 Before Judges SHEBELL and KLEINER.
*277 Francis T. Giuliano argued the cause for respondent-appellant (Mr. Giuliano, on the brief).
Richard Kushinsky argued the cause for petitioner-appellee (Kushinsky, Gans & Chaplick, attorneys; Louis S. Scalzo, on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
Petitioner, Milton Perez, filed two Workers' Compensation Claim Petitions alleging that as the result of "climbing, installing, pulling wire [and] carry[ing] ladder[s]" while employed by respondent, Monmouth Cable Vision, he suffered permanent disability in his right hand. Claim petition number XX-XXXXXX, alleged an accident claim, and claim petition number XX-XXXXXX, alleged an occupational exposure. The occupational claim alleged exposure from 1986 to the time of filing on December 11, 1991. The accident was alleged to have occurred on November 13, 1991. Petitioner claimed that he sustained "aggravation, acceleration, exacerbation of pre-existing injury to right wrist, involving nerves and ligaments requiring surgery, [and] neurologic sequelae." The claim petitions were consolidated for trial.
The trial was held on March 8, March 29, and May 10, 1993. On May 12, 1993, the judge issued his decision. He found in favor of the petitioner, and awarded 12 1/2% permanent partial disability of petitioner's right hand, amounting to $3,154.38. Respondent appeals.
The respondent stipulated that the petitioner was in the employ of the respondent on the dates alleged in the two claim petitions. It was agreed by the parties that all medical and temporary disability benefits have been paid.
The petitioner testified that he was employed by respondent in 1986, but prior to that he worked at Mike's garage where he sustained a laceration to his right wrist requiring sixteen to twenty stitches. Petitioner first worked as an installer for the *278 respondent, running cable from the poles to the houses. He was later promoted to service technician. Petitioner gave the following description of his installing duties:
We take the cable from a spool weighing 50 to 75 pounds, put it on a caddy, pull the cable from the pole or from the house pull it, you get it up the pole, you pull the cable and you tighten it up.
Petitioner testified that he worked eight hours a day and that his duties were performed "on a constant, repetitive, weekly basis."
Petitioner worked for respondent for approximately four years before having problems with his wrist. He indicated that his right hand then began to bother him and that his right thumb started going numb. He mentioned the numbness to his supervisor and indicated that he had a lump. The lump became increasingly bigger as time went on. On November 13, 1991, petitioner had the lump removed by same-day surgery. The lump was a neuroma, which is a benign tumor growing on a nerve.
Petitioner was out of work for about four days. When he returned, he was placed on light duty for about two weeks. He then returned to his regular job, which involved wire repair, climbing poles, carrying a 50 to 75 pound ladder and pulling cable. Petitioner did not lose any further time from work because of his right thumb, nor did he receive any post-operative treatment. In October 1992, petitioner was promoted to a supervisory position, which basically entails paperwork except when he may be required to substitute for an absent installer.
Petitioner testified that he still has "problems" with his right hand and that his thumb still goes numb. He testified that he has a loss of grip strength in his right hand, because he cannot use his thumb. He has pain in his wrist, which occurs when he's playing with his children and they grab his wrist, or if anyone were to squeeze his wrist. He testified that he still played sports but not as well as he used to. He plays volleyball every Wednesday night for about two hours and in September 1992, he began weightlifting *279 twice a week. When he first started weightlifting, he had trouble with his right hand, but he has improved with time.
Petitioner was examined by Dr. Riss, at his attorney's request, and Dr. Sawyer, at the respondent's request. Dr. Riss testified that he examined the petitioner on April 30, 1992. At the time of the examination, he reviewed the operative report, the same-day surgery report, and the pathology report. These reports were admitted into evidence. Dr. Riss elicited the same subjective complaints from the petitioner as petitioner had testified to at trial. Dr. Riss stated that he considered the subjective complaints along with his objective examination to verify if the complaints were reasonably in accordance with his findings. He maintained that his estimation of disability was based on demonstrable objective medical evidence of restriction of function.
Dr. Riss recounted:
My examination revealed a 5.9 centimeter scar over the anterior right wrist. There was tenderness to palpation over the anterior and lateral aspects of the wrist. Wrist flexion was 50 degrees on the right and 65 degrees on the left. Extension was 45 degrees on the right and 60 degrees on the left. Inversion was 35 degrees on the right and 45 degrees on the left. Eversion was five degrees on the right and ten degrees on the left. Pronation was complete. Supination was to 160 degrees on the right as compared to 180 degrees on the left.
The strength was diminished on the right as compared to the left. The petitioner is right-hand dominant. Sensation was equal and normal.
I examined the thumb and flexion of the first digit of the metacarpal phalangeal joint was 45 degrees on the right and 75 degrees on the left. Extension was 180 degrees bilaterally. Flexion of the interphalangeal joint of the first digit was 80 degrees bilaterally. Extension was to 180 degrees bilaterally. He was able to make a fist. He was able to flex, flair, extend, and oppose all digits. Examination of the circumference of the right and left forearms measured 31 and three-quarter centimeters. The right wrist measured 18 and one-quarter centimeters and the left wrist measured 17 and three-quarters centimeters. The right palm measured 23 centimeters and the left palm measured 22 and three-quarters centimeters.
Dr. Riss diagnosed the petitioner as having "neuroma, right hand, status-post excision of neuroma with primary repair of sensory nerve." Dr. Riss reported:
It was my opinion that there was demonstrable, objective medical evidence of restriction of function and lessening to a material degree of working ability, and *280 that the petitioner was disabled orthopedically to the extent of 45 degrees [sic] of the right hand.
Petitioner's supervisor testified that he was not aware that petitioner was having any problems with his wrist and that after the surgery he put petitioner on light duty for about two weeks. He further testified that he promoted petitioner to lead technician in November 1992, which entails doing quality checks on the service technicians and that if a service technician was out sick, the lead technician would do his job. He also indicated that there was no sign of diminution of petitioner's performance between November 1991 and November 1992.
Dr. Blackwell Sawyer, Jr., F.A.C.S., respondent's expert, testified that he examined the petitioner on July 16, 1992. Petitioner indicated that at times the area of surgery was sensitive, but that he had no numbness or functional impairment. Dr. Sawyer performed a physical examination of the petitioner and found that the wrist and hand did not reveal any visible abnormality or deformity, except a two inch scar over the volar aspect of the right wrist on the radial side, which was well-healed, without swelling or mass. He found that palpation was not sensitive, there was no Tinel's sign, and no sensory loss in the thumb. He contended that the range of motion of the wrist, thumb and fingers was full, with no power loss.
Dr. Sawyer determined that petitioner had "a neuroma involving the sensory nerve to the right thumb," which was related to the work. The doctor stated that there was no residual permanency. Dr. Sawyer further testified that the petitioner's extracurricular activities also reinforced his determination that there was no permanent disability, because volleyball and weightlifting are "extracurricular activit[ies] of some power that is done voluntarily which would tend to reinforce a healthy function."
Dr. Sawyer noted in his report that the petitioner had a reattachment of two nerve ends. He also indicated that nerves do not regenerate themselves like muscles, but that the petitioner would not necessarily have residual pain from this reattachment. *281 Dr. Sawyer testified that if petitioner had continual numbness in his thumb and continual pain in his wrist that his determination of no permanent disability would change because that would indicate that petitioner had some nerve malfunction. He also noted that petitioner could weightlift and play volleyball with nerve deficit, and that sometimes muscle building is used as physical therapy in order "to support the muscles around the nerves and the bones and the joints to give them greater strength and flexibility." Dr. Sawyer opined that a sensory nerve deficit should not affect petitioner's power and that even if he has numbness in his thumb his strength should be the same.
Dr. Sawyer indicated that although the petitioner related complaints of pain in the area of the scar, when the examiner palpated that area, there was no indication of sensitivity. Dr. Sawyer testified that as the petitioner's range of motion of the wrist, thumb and fingers was full, this meant that there was no joint malfunction, and no residual of scarring about structures to restrict them. He also indicated that he did a grasp test for power loss and a pinch grip test.
The judge considered the condition an occupational disease as there was no proof of a specific accident or incident. The judge observed that the only issue before him was the nature and the extent of permanent disability and its causality to the employment with the respondent. He determined that petitioner had established the causal relationship between his neuroma and his employment with the respondent.
The judge further determined that petitioner met the requirements set forth in Perez v. Pantasote, 95 N.J. 105, 469 A.2d 22 (1984) and found petitioner's disability to be 12 1/2% of the right statutory hand. Respondent contends that the petitioner did not meet his burden of proof under Perez, supra, 95 N.J. 105, 469 A.2d 22, because he did not prove by demonstrable objective medical evidence that he sustained a permanent partial disability to his right hand and that petitioner's injury was a minor injury and not compensable under N.J.S.A. 34:15-36.
*282 The scope of appellate review in workers' compensation cases is set forth in Close v. Kordulak Bros., 44 N.J. 589, 210 A.2d 753 (1965):
[T]he standard to govern appellate intervention ... is the same as that on an appeal in any nonjury case, i.e., "whether the findings made could reasonably have been reached on sufficient credible evidence present in the record," considering "the proofs as a whole," with due regard to the opportunity of the one who heard the witnesses to judge of their credibility and, in the case of agency review, with due regard also to the agency's expertise where such expertise is a pertinent factor.
[Id. at 599, 210 A.2d 753 (citation omitted); DeAngelo v. Alsan Masons Inc., 122 N.J. Super. 88, 89-90, 299 A.2d 90 (App.Div.), aff'd o.b., 62 N.J. 581, 303 A.2d 883 (1973); Goyden v. State Judiciary, 256 N.J. Super. 438, 446, 607 A.2d 651 (App.Div. 1991), aff'd, 128 N.J. 54, 607 A.2d 622 (1992).]
The petitioner has the burden of proving the elements of his case by a preponderance of the probabilities. Lister v. J.B. Eurell Co., 234 N.J. Super. 64, 72, 560 A.2d 89 (App.Div. 1989). The Lister court stated:
The standard is one of reasonable probability; i.e., whether or not the evidence is of sufficient quality to generate a belief that the tendered hypothesis is in all likelihood the truth. The evidence must be such as to lead a reasonably cautious mind to the given conclusion. "It need not have the attribute of certainty, but it must be well founded in reason and logic, mere guess or conjecture is not a substitute for legal proof."
[Id.; Harbatuk v. S & S Furniture Systems Insulation, 211 N.J. Super. 614, 620, 512 A.2d 537 (App.Div. 1986).]
We will not disturb the factual findings and legal conclusions of the trial judge unless they are "manifestly unsupported by or inconsistent with competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974).
Permanent partial disability is defined as:
a permanent impairment caused by a compensable accident or compensable occupational disease based upon demonstrable objective medical evidence, which restricts the function of the body or of its members or organs; included in the criteria which shall be considered shall be whether there has been a lessening to a material degree of an employee's working ability. Subject to the above provisions, nothing in this definition shall be construed to preclude benefits to a worker who returns to work following a compensable accident even if there be no reduction in earning. Injuries such as minor lacerations, minor contusions, minor sprains, and *283 scars which do not constitute significant permanent disfigurement, and occupational disease of a minor nature such as mild dermatitis and mild bronchitis shall not constitute permanent disability within the meaning of this definition.
[N.J.S.A. 34:15-36 (1989).]
This definition of permanent partial disability was first enacted as part of the extensive amendments to the workers' compensation law which became effective January 10, 1980. It was the first statutory definition of permanent partial disability. Perez v. Pantasote, supra, 95 N.J. at 111, 469 A.2d 22. The 1980 amendments' primary goal was to eliminate awards for minor partial disabilities, to increase awards for the more seriously disabled, and to contain the overall cost of workers' compensation. Id. at 114, 469 A.2d 22.
After carefully considering the legislative history and the case law which developed in New Jersey prior to the legislative changes, the Supreme Court instructs us that:
In summary, then, the employee must first prove by demonstrable objective medical evidence a disability that restricts the function of his body or its members or organ. Second, he must establish either that he suffered a lessening to a material degree of his working ability or that his disability otherwise is significant and not simply the result of a minor injury. The burden of proving both of these elements rest with the petitioner.
[Id. at 118, 469 A.2d 22.]
If there has not been an appreciable impairment of the employees ability to work we may look to a second criterion, "whether there has been a disability in the broader sense of impairment in carrying on the `ordinary pursuits of life.'" Id. at 117, 469 A.2d 22.
Petitioner clearly meets the first criterion that there must be a satisfactory showing of demonstrable objective medical evidence of functional restriction of the body, its members or organs. Id. at 116, 469 A.2d 22. "`Objective Medical evidence is understood to mean evidence exceeding the subjective statement of the petitioner.'" Ibid. This does not mean that the subjective complaints of the petitioner are to be excluded. Saunderlin v. E.I. DuPont Co., 102 N.J. 402, 412, 508 A.2d 1095 (1986). The extent and manner to which the professional analysis must go *284 beyond those complaints in order to constitute demonstrable objective medical evidence depends upon the nature of the disability. Id. at 412, 508 A.2d 1095. "In most physical disability claims, medical analysis quickly goes beyond the subjective statement by the patient to clinical and laboratory tests by the physician. The medical diagnosis usually looks for, and is in terms of, observable, measurable, physical manifestation." Ibid.
In this case, the Judge of Compensation noted Dr. Riss' extensive experience and that he examines "about a thousand of these hands a year." The doctor's testimony compared the specific degrees of motion found in each hand and thumb. Considering the ranges of motion on the left extremity as normal, the losses he found in the right wrist and thumb can be graphically observed as follows:

 Left Right Loss of Motion Loss of Motion
Wrist (degrees) (degrees) in degrees in percentages
Flexion 65 50 -15 23
Extension 60 45 -15 25
Inversion 45 35 -10 22
Eversion 10 5 - 5 50
Supination 180 160 -20 11
Thumb
Flexion 75 45 -30 42

Dr. Riss' examination also revealed that the petitioner had tenderness in his right wrist, and that the strength in his right wrist was diminished as compared to the left wrist. The judge accepted Dr. Riss' testimony. The "choice of accepting or rejecting testimony of witnesses rests with the administrative agency and where such choice is reasonably made, it is conclusive on appeal." Renan Realty Corp. v. Community Affairs Dept., 182 N.J. Super. 415, 421, 442 A.2d 614 (App.Div. 1981).
Dr. Sawyer agreed that with the excision of the neuroma, the nerves have to be reattached and that they do not regenerate themselves like muscles. He also indicated that if petitioner was *285 experiencing continual pain and numbness in his wrist and thumb that his determination would be that he had a permanent disability because that would indicate some nerve malfunction. However, he also testified that he could not recall doing the requisite test to determine if there was any sensory loss. Nor did Dr. Sawyer relate any specific degrees of motion for either wrist or either thumb.
As indicated, the extent that professional analysis must go beyond the subjective complaint to constitute demonstrable objective medical evidence depends on the nature of the disability. Saunderlin, supra, 102 N.J. at 412, 508 A.2d 1095. In this case, the surgery to the wrist involved excision of a tumor and required nerve reattachment. This was itself objective evidence of the underlying condition. In addition, it is significant that Dr. Riss explained:
I am part and parcel of this examination. As he moves, my hands are on his hands and I have to establish to my own thinking and to myself that these are reasonable and proper degrees of motion of the particular movements that I asked him to do.

[Emphasis added.]
Such testing is clearly more valid and objective medical evidence of disability than merely asking the subject to perform certain movements and relying on the subjective response to what may be self imposed limitation. Based on these range of motion tests, Dr. Riss found the significant restriction from the norm in petitioner's right hand and thumb movement, which we have outlined above.
Thus, the evidence went beyond the petitioner's subjective complaint. We conclude that the judge reasonably found, based on the record as a whole, that the petitioner had an objectively demonstrable permanent partial disability to his right hand.
Our inquiry, however, must continue, as the next criterion to be satisfied is whether the injury is merely minor in nature, or whether it is serious enough to merit compensation. Perez, supra, 95 N.J. at 116, 469 A.2d 22. We must agree with respondent that on this record, it is questionable whether petitioner has established by a preponderance of the evidence that because of his *286 disability petitioner has suffered a lessening to a material degree of his working ability. Id. at 116-117, 469 A.2d 22. Nonetheless, "other factors besides lessening of working ability" must be considered. Id. at 117, 469 A.2d 22. As stated in Perez:
A second criterion is whether there has been a disability in the broader sense of impairment in carrying on the "ordinary pursuits of life." In this respect, N.J.S.A. 34:15-36 cautions that a return to work at the same wages need not preclude compensability. This concept is an endorsement of the well-established principle in New Jersey compensation law that impairment of earnings or earning capacity is not a necessary prerequisite to a finding of partial permanent disability.

Everhart v. Newark Cleaning & Dyeing Co., 119 N.J.L. 108, 111 [194 A. 294] (E. & A. 1937); Burbage v. Lee, 87 N.J.L. 36 [93 A. 859] (Sup.Ct. 1915).
[Perez, supra, 95 N.J. at 117, 469 A.2d 22.]
The finding of the Judge of Compensation that "there has been a diminution in the ability to use his right hand, a clear functional loss which has been proven by demonstrable objective medical evidence," when viewed with petitioner's testimony as to his complaints of pain, numbness and impairment, together with an analysis of the extent of the loss of function of petitioner's wrist and thumb, compels the conclusion that the disability is significant, not minor, and of necessity must detract from the former efficiency of that part of the body in petitioner's ordinary pursuits of life. Id. at 118, 469 A.2d 22. The evaluation of petitioner's disability as 12 1/2% of the statutory hand is not disputed on appeal. Indeed the losses of motion found by Dr. Riss easily substantiate the judge's evaluation. It would be difficult to perceive that a loss of one-eighth of the total function of the hand would not have the consequence of significantly detracting from the ordinary pursuits of life in so active an individual.
Affirmed.