705 A.2d 1243

ZENON LESNIEWSKI, PETITIONER–RESPONDENT, v. W.B. FURZE CORPORATION, RESPONDENT–APPELLANT, AND FOUR STAR CONSTRUCTION AND EJ'S GRILLE, RESPONDENTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 22, 1998—Decided February 23, 1998.

Before Judges SHEBELL, D'ANNUNZIO and COBURN.

*John J. Jasieniecki,* argued the cause for respondent-appellant (*Thomas H. Green,* attorney; *Mr. Jasieniecki,* on the brief).

*Richard L. Kuhrt,* argued the cause for respondent-respondent (*Kuhrt & Femia,* attorneys; *Mr. Kuhrt,* on the brief)

*Valerie L. Egar,* Deputy Attorney General, argued the cause for State of New Jersey Uninsured Fund (*Peter Verniero,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Ms. Egar,* on the brief).

*Penelope Caamano,* argued the cause for respondent-respondent, Four Star Construction (*Law Offices of Frieland & DeSanto,* attorneys; *Anita L. O'Carroll,* on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

This is an appeal of a Workers' Compensation judgment that found W.B. Furze Corporation (Furze Corp.) to be the employer of petitioner, Zenon Lesniewski, at the time he was injured in the course of his employment on April 17, 1995. We affirm.

On April 17, 1995, petitioner suffered a catastrophic injury at the construction site of EJ's Grille at 651 North Michigan Avenue, Kenilworth. The injury left him a paraplegic. The first floor of the building under construction was essentially complete, with the exception of an opening in the floor for the basement staircase. To access the basement, workers placed a ladder against the frame of the opening and as petitioner was descending the ladder, it slid out causing him to fall to the concrete floor and sustain his injuries. The facts surrounding petitioner's employment follow.

In 1994, Eugene Lord and Joseph O'Neill formed a corporation called EJ's Grille, Inc. (EJ's) and purchased a building to start a restaurant business. They had planned to renovate the building and hired Four Star Construction to gut the old building, but later decided to raze the old building and construct a new one. They hired a contractor to demolish the structure and excavate the lot. They also hired an architect to design a new building, and engaged subcontractors for the electric, heating and air conditioning, and roofing. Lord, the president of EJ's, obtained all of the necessary local permits. EJ's maintained no workers' compensation insurance during the time that the building was under construction.

In November 1994, Wayne Furze, the principal of Furze Corp., became acquainted with EJ's. Furze Corp. is a contracting company engaging in masonry, carpentry, and construction work. Furze Corp. maintained workers' compensation insurance. O'Neill, vice president of EJ's, asked Furze whether his company would be interested in doing masonry block work. Furze, without a written contract, accepted O'Neill's offer for his company to work as a subcontractor. The verbal agreement was that the company would be paid by the block and by the yard of concrete. Furze billed EJ's for his services by submitting "W.B. Furze Company, General Contractors," invoices. Supplies were purchased by Furze on that company's line of credit. A sign stating that Furze Corp. was the general contractor was placed at the site and remained there throughout construction.

In November 1994, Lesniewski passed the construction site and observed Furze and O'Neill looking at plans. He was unemployed at the time and, therefore, inquired of O'Neill whether they needed a mason. O'Neill told him to speak with Furze. Furze hired Lesniewski and after observing petitioner on the job, told him that he would pay $15.00 per hour.

In November 1994, Furze performed work on the foundation. Upon completion of the foundation work, Furze did not work at the site again until around December 10, 1994 when block work needed to be done on the roof line.

O'Neill worked at an auto body shop located across the street from the construction site. He would frequently visit the job site, but would never tell Furze how his job should be performed, how many hours he should work, or what types of materials to use. Further, he did not instruct Furze on who to hire or fire. O'Neill testified that he did not possess the technical expertise to supervise the site, as he could not read blueprints. Likewise, Lord would visit the site one to three times a week for short periods of time, but would not provide any directions to Furze or his workers. The only supervision Furze received was from the architect, who would review the blueprints to determine whether the specifications were being followed.

The parties appear to agree that until the end of December 1994, Furze was an independent contractor and that petitioner was an employee of Furze. The dispute arises over whether the nature of the relationship between Furze and EJ's, and consequently petitioner's employment status, changed after December 1994. Even though all of the masonry work was completed, Furze stayed on to supervise the carpentry and steel work. Furze was no longer getting paid by the block. Instead, the pay was $200 a day for supervisory services. Lord consulted with Furze on which subcontractors to hire, however, Furze would supervise the subcontractors and answer any of their questions.

Furze testified that as construction progressed, Lord and O'Neill became more active during their visits to the site, including the reviewing of blueprints. Despite these changes, Furze continued to bill for materials and labor on company invoices of Furze Corp. Also, checks were made payable to the Furze Corp. Eugene Lord, president of EJ's, asserted that Furze Corp. was always a contractor, and that the nature of that relationship never changed. In contrast, Furze felt his company was no longer a contractor but that he was an individual employed as a "foreman."

Similar ambiguities surround Lesniewski's employment status. Lesniewski worked two days in November. He then came back when work began again in December, but only worked four or five

days in January 1995. Furze would instruct petitioner on his daily assignments. Petitioner used a few of his own tools and the rest were provided by Furze. Furze kept track of petitioner's hours and would personally hand petitioner his pay in cash in an envelope each week. Petitioner did not report the cash and continued to collect unemployment compensation while working at the site. Petitioner was also used on several jobs other than the EJ's job when he was being paid directly by Furze Corp.

In March 1995, petitioner again worked at the site but was paid by EJ's. Furze made up slips of paper with workers' first names, hours worked, and total amounts of pay due. He forwarded the slips to Lord whose secretary drew checks on EJ's account. The payee lines were left blank on the checks, as Furze never gave workers' full names to Lord. Four checks, which were handed to petitioner by Furze, were shown to have been drawn on EJ's account. They were dated March 24, 1995, payable to Rader Lesniewski; April 7, 1995, payable to M. Lesniewski; April 14, 1995, payable to Zenon Lesniewski; and March 31, 1995, payable to Rader. Petitioner's understanding of why he was receiving checks drawn on EJ's account was that Furze Corp. was experiencing a cash flow problem and that EJ's and Furze would settle the matter later. Despite the change in method of payment, petitioner continued to believe that he was employed by Furze Corp.

On June 1, 1995, petitioner filed a Claim Petition with the Division of Workers' Compensation alleging he was injured during and in the course of his employment, naming EJ's as respondent. Since EJ's did not carry workers' compensation insurance, petitioner's claim was classified as an uninsured claim implicating the State of New Jersey, Uninsured Employer's Fund, *N.J.S.A.* 34:15–120.1, *et seq.*, as a party.

On June 30, 1995, petitioner filed a second petition naming Furze as respondent. On August 28, 1995, Furze filed an answer alleging petitioner was not employed by Furze at the time of the

accident but by EJ's. On September 25, 1995, petitioner filed a third petition naming Four Star Construction as respondent.

Trial was held on October 24, 1995, November 14, 1995, December 5, 1995, December 15, 1995, January 16, 1996, and February 6, 1996. On April 30, 1996, the judge ruled that Furze was petitioner's employer and on May 6, 1996 judgment was entered compelling payment of medical and temporary disability benefits. The claims against EJ's, Four Star Construction, and the Uninsured Employer's Fund were dismissed.

The judge found that Furze Construction was an independent contractor during the disputed period, stating:

> The respondent EJ's Grille, Inc. stated very clearly that Mr. Furze was not his employee, that Mr. Furze had placed a sign ... on the construction site advertising himself as a general contractor and that he submitted invoices on W.B. Furze stationary which is ... in evidence for work performed after the masonry work was completed, and that supplies were purchased with W.B. Furze Company credit ... Further, the respondent EJ's Grille, Inc. testified that Mr. Furze always received a check made payable to his company, not to himself personally.
>
> After looking at all the aforementioned facts and applying the existing law as set forth in *Aetna Insurance Co. Inc. v. Trans American Trucking Service, Inc.*, 261 *N.J.Super.* 316, 618 *A.*2d 906 (App.Div.1993), *Condon v. Smith*, 37 *N.J.Super.* 320, 117 *A.*2d 272 (App.Div.1995[1955]), *Pollack v. Pino's Formal Wear*, 253 *N.J.Super.* 397, 601 *A.*2d 1190 (App.Div.1992), Larson, *Workmen's Compensation Law* § 45.20 (1994) and *Kelly v. Geriatric and Medical Services, Inc.*, which is cited as No. A-1001-94T5 (App.Div. Feb. 29, 1996) decided by the Appellate Division on February 29, 1996, I can only come to one conclusion, that the petitioner at the time of the accident was in the employ of Mr. Wayne Furze who was doing business as W.B. Furze Construction Company.

The judge then found that Lesniewski was an employee of Furze Construction:

> The employment agreement of $15 per hour was negotiated and determined by the petitioner and Mr. Furze. Mr. Furze solely had the right to hire and fire the petitioner. The only scintilla of evidence pointing away from Mr. Furze is the fact that the petitioner accepted part of his payment by way of EJ's Grille, Inc.'s check. Yet, the respondent EJ's Grille did not direct, control or supervise the petitioner. In *Santos v. Standard Havens, Inc.*, 225 *N.J.Super.* 16, 23 [541 *A.*2d 708] (App.Div.1988), the court disposed this issue. In that case, the Court held that the name of the paycheck is one of the many considerations and may have little probative value. Certainly in this case, this one minuscule fact falls under the overwhelming weight of the other tests as previously enumerated in determining the employer.

The standard for our review of a decision of the Division of Workers' Compensation is detailed in *Close v. Kordulak Bros.*, 44 *N.J.* 589, 210 *A.*2d 753 (1965):

[T]he standard to govern appellate intervention with respect thereto is the same as that on an appeal in any nonjury case, i.e., "whether the findings made could reasonably have been reached on sufficient credible evidence present in the record," considering "the proofs as a whole," with due regard to the opportunity of the one who heard the witnesses to judge of their credibility, and, in the case of agency review, with due regard also to the agency's expertise where such expertise is a pertinent factor.

[*Id.* at 599, 210 *A.*2d 753 (quoting *State v. Johnson*, 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)).]

The petitioner has the burden of proving the elements of his case by a preponderance of the probabilities. *Perez v. Monmouth Cable Vision*, 278 *N.J.Super.* 275, 282, 650 *A.*2d 1025 (App.Div.1994), *certif. denied,* 140 *N.J.* 277, 658 *A.*2d 301 (1995).

The standard is one of reasonable probability; i.e., whether or not the evidence is of sufficient quality to generate a belief that the tendered hypothesis is in all likelihood the truth. The evidence must be such as to lead a reasonably cautious mind to the given conclusion. "It need not have the attribute of certainty, but it must be well founded in reason and logic; mere guess or conjecture is not a substitute for legal proof."

[*Lister v. J.B. Eurell Co.*, 234 *N.J.Super.* 64, 72, 560 *A.*2d 89 (App.Div.1989).]

When reviewing an agency determination, "due regard [should be given] to the agency's expertise where such expertise is a pertinent factor." *Close, supra,* 44 *N.J.* at 599, 210 *A.*2d 753. The factual findings and legal conclusions of the trial judge will not be disturbed unless they are "manifestly unsupported by or inconsistent with competent, relevant and reasonably credible evidence as to offend the interest of justice." *Perez, supra,* 278 *N.J.Super.* at 282, 650 *A.*2d 1025 (quoting *Rova Farms Resort v. Investors Ins. Co.,* 65 *N.J.* 474, 323 *A.*2d 495 (1974)); *see also Kertesz v. Korsh,* 296 *N.J.Super.* 146, 151–52, 686 *A.*2d 368 (App. Div.1996).

Furze Corp. contends that in January 1995, it was no longer engaged as an independent contractor by EJ's. Instead, Furze as an individual had become an employee of E.J.'s, and as a result, Lesniewski was no longer employed by Furze, but by E.J.'s. Furze

Corp. concludes that E.J.'s should, therefore, be liable for petitioner's injuries.

The term employee is defined by statute as:

synonymous with servant, and includes all natural persons, including officers of corporations, who perform service for an employer for financial consideration, exclusive of (1) employees eligible under the federal "Longshore and Harbor Workers' Compensation Act," 44 Stat. 1424 (33 U.S.C. § 901 *et seq.*), for benefits payable with respect to accidental death or injury, or occupational disease or infection; and (2) casual employments, which shall be defined, if in connection with the employer's business, as employment the occasion for which arises by chance or is purely accidental; or if not in connection with any business of the employer, as employment not regular, periodic or recurring; provided, however, that forest fire wardens and forest firefighters employed by the State of New Jersey shall, in no event, be deemed casual employees.

[*N.J.S.A.* 34:15–36.]

In contrast, independent contractor's do not fall within the Worker's Compensation Act. An independent contractor is defined as:

one who, carrying on an independent business, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work.

[*Cappadonna v. Passaic Motors, Inc.,* 136 *N.J.L.* 299, 300, 55 *A*.2d 462 (Sup.Ct. 1947), *aff'd,* 137 *N.J.L.* 661, 61 *A*.2d 282 (E. & A.1948).]

There are two tests to determine if an individual is an "employee" or an independent contractor: (1) the "control test" and (2) the "relative nature of the work test." *Pollack v. Pino's Formal Wear & Tailoring,* 253 *N.J.Super.* 397, 407, 601 *A*.2d 1190 (App.Div.) (quoting *Smith v. E.T.L. Enterprises,* 155 *N.J.Super.* 343, 350, 382 *A*.2d 939 (App.Div.1978)), *certif. denied,* 130 *N.J.* 6, 611 *A*.2d 646 (1992).

Under the "control test," a master-servant relationship exists "whenever the employer retains the right to determine not only what shall be done, but how it shall be done." *Id.* at 408, 601 *A*.2d 1190 (quoting *Condon v. Smith,* 37 *N.J.Super.* 320, 325, 117 *A*.2d 272 (App.Div.1955)). The right of control is more determinative than the actual exercise of control. *Ibid.* Thus, an employer may not be able to give effective direction to an employee because

of an employee's superior expertise, but the lack of direction does not turn the employee into an independent contractor. *Ibid.*

There are several factors to be considered in determining whether a master-servant relationship exists under the "control test." These factors include, among others, evidence of the right of control, right of termination, furnishing of equipment, and method of payment. *Aetna Ins. Co. v. Trans American Trucking Service, Inc.,* 261 *N.J.Super.* 316, 327, 618 *A.*2d 906 (App.Div. 1993).

Under the "relative nature of the work test," an employer-employee relationship will be found if there is a "functional integration" of their respective operations. *Caicco v. Toto Brothers, Inc.,* 62 *N.J.* 305, 310, 301 *A.*2d 143 (1973); *see also Rossnagle v. Capra,* 127 *N.J.Super.* 507, 517, 318 *A.*2d 25 (App.Div.1973) (stating that a "court will inquire into whether the work done by the petitioner was an integral part of the regular business of the respondent. If such is found then the court will determine that an employment relationship existed."), *aff'd o.b.,* 64 *N.J.* 549, 318 *A.*2d 20 (1974).

Furze Corp. maintains that as an individual Furze was in an employer/employee relationship with EJ's beginning in January 1995. It urges that this relationship is evident from the change in the method of payment from by the block to a daily rate. As a result of this change, Furze Corp. argues that it could not have been Lesniewski's employer.

The purchase of personal labor by the hour, day, or week can be a strong indication of an employer/employee relationship. *See* Arthur Larson, *Workmen's Compensation Law* § 44.33. By paying according to time, an employer will typically want to see that the time is spent efficiently. *Ibid.* Thus, if a person is paid by the day, an employer might establish what time the employee may arrive, take lunch breaks, and leave. *Ibid.*

Furze relies upon cases in which payment by time led to the finding of an employer-employee relationship: *Bituminous Casu-*

*alty Corp. v. Wilkes*, 77 *Ga.App.* 764, 49 *S.E.*2d 916, 918 (1948) (finding that although claimant used his own tools, hired his own workers, set his own schedule, and was unsupervised, he was an employee, because the employer had the right to control him as derived from an hourly wage by checking up on how time was spent or by terminating his employment at any time); *Lawrence v. Industrial Comm'n*, 391 *Ill.* 80, 62 *N.E.*2d 686, 687–90 (1945) (finding that claimant, who was hired to repair plaster in set of rooms and who provided his own equipment and supplies, was an employee because he was paid an hourly wage, which is indicative of such a relationship, and he was supervised from room to room and directed as to what to fix); *Denman v. Many & Zanetti*, 8 *N.Y.*2d 799, 202 *N.Y.S.*2d 16, 18–19, 168 *N.E.*2d 250, 252 (1960) (finding that claimant hired to rototill neighbor's corn field was an employee because he was paid an hourly rate, even though he supplied his own equipment, had discretion as to when work would be completed and performed similar services for other farmers); *Clark v. Hughey*, 233 *Ind.* 134, 117 *N.E.*2d 360, 361 (1954) (finding that carpenter, who provided his own supplies and tools but was observed by the owner and was paid an hourly wage, was an employee and that, in case of doubt, relationship should be resolved in favor of employee status).

Here, Furze was compensated at a daily rate, and as the above cases demonstrate a daily rate often indicates that an employer has a right of control over the time in which work is completed and whether to terminate the employee. However, the daily rate paid to Furze did not provide EJ's with the opportunity or ability to control the hours Furze worked. In supervising the work of other contractors, Furze's hours and pace were tied to that of the contractors. Additionally, as is characteristic of a contractor, the parties agreed that Furze would act as a supervisor for a set period until the completion of construction. Thus, even though Furze was paid a daily rate, that rate could not be used to control Furze because his daily work schedule and pace were tied to that of the other independent contractors, and his term of employment was established by agreement of the parties.

█ Assuming the daily rate had weighed in favor of finding an employer/employee relationship, other factors weigh strongly against it. Even after January, Furze continued to obtain his supplies on Furze Corp. credit, and company invoices continued to be submitted to EJ's. Moreover, the record does not indicate that EJ's provided any direction or supervision over Furze at the site. Thus, the control test weighs against concluding Furze was an employee.

Under the relative nature of work test, Furze Corp. maintained a separate identity during the period in question. The sign advertising Furze Corp. as a general contractor remained at the site for the duration of construction. Furze submitted company invoices to EJ's and EJ's made checks payable to Furze, the construction company, not Furze as an individual. Finally, Furze Corp. had at least two other jobs while working for EJ's as evidenced by petitioner's also working for Furze Corp. at the other sites. It appears that Furze Corp. was a viable, independent corporate business entity between January 1995 and April 1995. Thus, the relative nature of the work test weighs in favor of finding that Furze was an independent contractor during the period in question.

█ Furze Corp. asserts that EJ's was itself a contractor for Workers' Compensation purposes, because it incorporated for the purpose of building a restaurant and because it hired subcontractors. However, we have held that an owner of property is not a contractor for Workers' Compensation Act purposes in such circumstances. *Pollack, supra,* 253 *N.J.Super.* at 404, 601 *A.*2d 1190. When an owner of property has a building constructed for the owner's use, the owner does not *ipso facto* become a contractor by letting out the masonry, plumbing, carpentry and electrical work to different people by separate contracts. *Ibid.* (citing *Mittan v. O'Rourke,* 115 *N.J.L.* 177, 178 *A.* 797 (Sup.Ct.1935)). In *Mittan, supra,* the court addressed the issue of whether the owner of property was a contractor and noted:

> Wilson was not in the business of building houses, but had contracted with the several mechanics to have a completed house erected; the work being given out in the several parts that go to make a completed structure. Each of the mechanics having the contract with Wilson, one for electrical work, another for carpenter work ... Now if Wilson had made one contract for the construction of the building he could not be called a "contractor" and the fact that the work was split up into parts does not alter the situation.
>
> [115 *N.J.L.* at 179, 178 *A.* 797.]

Furze insists that the work done from January 1995 until April 1995 was an integral part of the regular business of EJ's because one of the corporate goals of EJ's was to construct the restaurant. EJ's responds that the point of its business was not to construct buildings but rather to open and operate a restaurant. The record clearly reflects that EJ's, as an owner of property, had the building constructed for its own purposes. On the record presented, we are not persuaded that EJ's was a contractor. Nor does resolution of that issue in favor of Furze require reversal, as we find sufficient support in the record for the judge's conclusion that in any event Furze Corp. was an independent contractor from January 1995 through April 1995.

Furze contends, nonetheless, that Lesniewski became an employee of EJ's, beginning in January 1995. The "control test" and the "relative nature of work test" must be applied to determine who petitioner's employer was. Furze points to the change in the method of payment to substantiate that petitioner was an employee of EJ's. In April 1995, petitioner was given four pay checks drawn on EJ's account. Additionally, because Lord and O'Neill told Furze to "get some help" when it was time to perform masonry work on the floors, Furze argues that they were authorizing Furze to hire petitioner on their behalf.

The judge weighed these factors, but considered several other factors that weighed against Furze's arguments, as being more persuasive. We again note that even though petitioner received four paychecks drawn on EJ's account, this is only one factor that is to be considered. As pointed out in *Santos v. Standard Havens, Inc.*, 225 *N.J.Super.* 16, 541 *A.*2d 708 (App.Div.1988), the name of the payor on the paycheck may have little probative value

in determining the nature of the employment relationship.  *Id.* at 24, 541 *A.*2d 708.

In this case, the factual disputes surrounding the method of payment illustrate how this factor has little probative value.   In January 1995, when Furze and petitioner were allegedly employees of EJ's, petitioner was paid by Furze Corp. This weighs against Furze's contention that there was a change in the relationship.   EJ's explains that the change in the method of payment in April 1995 merely reflects an additional means Furze used to keep employees off of his payroll.   It contends that by having EJ's draw blank checks, Furze Corp. was able to avoid increases in its workers' compensation insurance premiums and avoid payroll taxes.   Furze, of course, denied the allegations, and petitioner understood the new arrangement was because Furze was having cash-flow problems and that Furze and EJ's agreed to "settle" it later.   Again, Furze denied this contention.   We conclude that these factual disputes detract from the weight that the method of payment factor contributes to the determination of the employment status issue.

Despite Furze's argument that EJ's gave its authority for petitioner to return to the job, the testimony indicates that Furze had discretion as to who to hire.   He was merely told to get "some help."   Thus, Furze appears to have had the right to hire and by implication the right to fire petitioner.   From January through April, petitioner continued to receive his assignments and directions from Furze.   That there was no change in the work relationship must be considered in applying the "control test."

The relative nature of the work test also weighs in favor of finding that there was no change.  Petitioner was dependent upon Furze for employment since he worked at two other Furze construction sites besides EJ's. Petitioner benefitted from Furze's willingness to pay him "under the table" so that he could continue to collect unemployment compensation.   Even when the payment method changed, petitioner was still paid under the table, by EJ's checks being made payable to his family members.   Petitioner

also used Furze's tools when necessary. These facts indicate that petitioner was dependent upon and became an integral part of Furze's business operation during the period in question.

Furze, nonetheless, urges that petitioner and EJ's should be equitably estopped from denying their employer/employee relationship. Furze contends that EJ's concealed the true relationship by not naming petitioner as "payee" on the four checks, thereby allowing petitioner to collect unemployment while EJ's was able to pay an employee while avoiding withholding taxes.

In determining whether to apply the doctrine of equitable estoppel, we consider whether "there was a course of conduct that, in its cumulative impact, was tantamount to a representation made by one party with the expectation that the other persons would rely on this conduct." *Hoefers v. Jones,* 288 *N.J.Super.* 590, 605, 672 *A.2d* 1299 (Ch.Div.1994), *aff'd,* 288 *N.J.Super.* 478, 672 *A.2d* 1177 (App.Div.1996). The party seeking relief must have detrimentally relied upon the tortfeasor's conduct, and the reliance must be reasonable. *Ibid.* We hold that regardless of the extent of Furze's reliance or the detriment it suffered, in these circumstances Furze had no right to rely on the creation of an employment status between petitioner and EJ's and that any such reliance cannot be considered reasonable.

Furze also argues that petitioner's violation of the New Jersey Insurance Fraud Prevention Act, *N.J.S.A.* 17:33A–1, *et seq.,* by concealing his employment relationship and collecting pay "under the table," should preclude him from recovering from Furze's insurance carrier. By not being paid on the record, petitioner's employment was allegedly not discoverable for purposes of potential audits for rating purposes, thereby subjecting the carrier to a risk not otherwise foreseen. Furze argues that the restitution provisions of the Act should preclude any recovery. Assuming that there was a violation of the Act, see *N.J.S.A.* 17:33A–4(a), the restitution provision provides only that: "[a]ny insurance company ... may sue ... in any court of competent

jurisdiction to recover compensatory damages...." *N.J.S.A.* 17:33A–7(a). It does not provide for the denial of a claim for injury by the employee. We find no Legislative intent that an insurance company can avoid having to sue for damages by having the court preclude the employee from recovering workers' compensation benefits.

We also reject as unsupported by law that petitioner's recovery of unemployment benefits should preclude any workers' compensation recovery. The judge stated he would notify the appropriate authorities, and thus appropriate remedial action can be taken without precluding recovery for so catastrophic an injury.

The judgment of the Division of Workers' Compensation is, therefore, affirmed.